STATE EX REL. JOHN J. PHELAN *vs.* ROBERT J. WALSH.

STATE EX REL. MARVIN H. SANGER *vs.* EDWARD S. HENRY.

New Haven & Fairfield Cos., May T., 1892. ANDREWS, C. J., CARPENTER, SEYMOUR, TORRANCE and FENN, Js.

The state constitution, art. 4, sec. 2, as amended in 1875 and 1884, provides for the election of state officers by ballot at the electors' meetings in November in alternate years, and for returns by the presiding officers of these meetings of the number of votes given for each candidate to the secretary of the state, who, with the treasurer and comptroller, is to make a fair list of the persons and number of votes given for each, and lay it, with the returns of the presiding officers, before the General Assembly next to be holden, on the first day of the session; the constitution further providing that the General Assembly shall by law prescribe the manner in which all questions as to the election of these officers shall be determined. The General Assembly in 1887 enacted the following statute (Gen. Statutes, § 240:) "The presiding officer shall, with the certificate upon the result of the electors' meeting which he is required to send by mail to the secretary of the state, send to the secretary his certificate of the whole number of names on the registry lists, the whole number checked as having voted at such election, the whole number of names not checked, the number of ballots found in each box, namely 'general' and 'representative,' and the number of ballots in each box not counted as in the wrong box, and the number not counted for being double, and the number rejected for other causes, which other causes shall be stated specifically in the certificate." An act passed in 1889, (Session Laws of 1889, ch. 247,) provided in the first section that all ballots shall be printed on plain white paper, furnished by the secretary of the state; that they shall be of uniform size, color, quality and thickness for each ballot of the same class; that "in addition to the official indorsement the ballots shall contain only the names of the candidates, the office voted for, and the name of the political party issuing the same;" and that "the name of the party issuing the ballot, the title of the office voted for,

Phelan *v.* Walsh—Sanger *v.* Henry.

and the names of the candidates shall be printed straight across the face of the ballots, in black ink, and in type of uniform size, to be prescribed by the secretary;" the ninth section provides that "if any envelope or ballot shall contain any mark or device so that it may be identified in such manner as to indicate who might have cast the same, it shall not be counted"; and the twelfth that "all ballots cast in violation of the foregoing requirements shall be void and not counted." In two *quo warranto* informations at the relation respectively of persons claiming to have been elected to the office of secretary and treasurer of the state, against persons occupying those offices by holding over from a former term by reason of the failure of the General Assembly to make any declaration of an election to the offices, it was held—

1. That ballots with the word "For" prefixed to the name of the office, were valid.
2. That ballots folded in an unusual and striking manner and creased by the folding, should be rejected.
3. That ballots found with printed party circulars in the same envelope, should be rejected.
4. That a number of ballots with the name of the candidate for judge of probate erased and another name written in in ink, all by the same hand, and others where the same change was made in pencil, and all by the same hand, were valid.
5. That a ballot with a part torn off was to be rejected.
6. That ballots that contained the words "Judge of Probate," but with no name of any candidate for the office, were valid.
7. That ballots that wholly omitted those words and the name of any candidate for the office, were valid.
8. That ballots that contained the name of a person as candidate for the probate judgeship who was not a resident of the probate district, were valid.
9. That ballots in one senatorial district which contained the name of a person, as candidate for the state senate, who was not a resident of the district, but was a candidate in another district, were valid.
10. That ballots on which the name of the candidate was printed "DE-FOREST," were not invalidated by the provision of the act of 1889 that the names should be printed in "type of uniform size."
11. That ballots on which the name of "Rathbun" as a candidate was printed "Rathburn," and the "r" stricken out, were valid.
12. That ballots with another name written under the printed name of the candidate for the probate judgeship, but without striking out the printed name, were to be rejected.
13. That ballots with two pasters, one on top of the other, were to be rejected.
14. That fourteen ballots, all of the same party, and each having a different name from the others for lieutenant-governor, put upon the ballots by a paster, the name being in writing and all of the same hand, should be rejected.
15. That a large number of ballots which contained slight but visible marks

that had the appearance of having been made by a pen, but a part of which were found to have been made by the plates in the printing and the rest to have been specks in the paper, were valid.

16. That ballots which had been returned by the presiding officers of the electors' meeting simply as rejected, without specifying any cause for the rejection, were improperly rejected and were to be counted in ascertaining the aggregate of the votes cast.

The ninth section of the act of 1889 provides that "if more than one ballot for the same office shall be found in any envelope, and such ballots shall be for the same person, only one shall be counted; and if such ballots shall be for different persons for the same office, neither of such ballots shall be counted." Presiding officers of electors' meetings had made returns to the secretary of a large number of votes as "rejected for being double," without stating that the ballots found together were for different candidates for the same office. Held that they were to be counted in making up the aggregate of votes cast, unless the relators, having the burden resting upon them of showing that they had a majority of all the votes cast, should show that they were rejected for a legal cause. (Two judges dissenting.)

[Argued September 2d—decided September 27th, 1892.]

Two informations in the nature of a writ of *quo warranto*, brought by the state at the relation of John J. Phelan and Marvin H. Sanger respectively, the former of whom claimed to have been elected to the office of secretary of the state, and the latter to that of treasurer of the state, against the defendants respectively, who were in possession of those offices by holding over from a former election; brought to the Superior Court in New Haven County, and heard together before *J. M. Hall, J.* The court made the following finding of facts in the case of *State ex rel. Phelan* v. *Walsh*, which, with some additional facts not important to the questions considered by this court, was made the finding in the other case.

1. At the general election for state officers, held on the 4th day of November, 1890, John J. Phelan, the relator, a citizen of the town of Bridgeport, was a candidate of the democratic party for the office of secretary of the state, and as such was voted for at that election. George P. McLean, Henry R. Palmer and Horatio H. Lane were the candidates of the republican, prohibition and industrial reform parties, respectively, at the same election for the same office; and all said candidates were electors of the state. There-

after, pursuant to the provisions of the constitution and statutes of the state, the presiding officers of the electors' meetings and other officials required to count, certify and return the votes cast in the several towns, and lodge a certificate thereof in the town clerks' offices of the respective towns, and transmit the certificates and returns thereof to the secretary, performed their several duties; and a count and canvass of the votes was duly made by the treasurer and comptroller, as required by the constitution, and a fair list by them made, which, together with the returns of the presiding officers and the certificates required by section 240 of the General Statutes, were laid before the General Assembly on the 7th day of January, 1891, being the first day of its session.

The General Assembly, however, did not make any declaration as to what person it found to be legally chosen to the office of secretary, nor has it at any time made such declaration, unless upon the facts found herein the Supreme Court as a matter of law shall decide otherwise; nor did said Assembly, on the second day of its session, by joint ballot of both houses proceed to choose a secretary from a list of the names of the two persons having the greatest number of votes so returned as aforesaid; nor has said General Assembly ever chosen any person to be secretary since the second day of its session.

The disagreeing action of the two houses of the General Assembly relative to the choice of secretary, and the final action of each house in voting to adhere to such disagreeing action, as particularly detailed and set forth in the complaint and admitted by the pleadings, I find true, and also I further find that it is impracticable for the General Assembly to take further action as to any declaration or choice of secretary, unless upon the facts herein found the Supreme Court as matter of law shall decide otherwise. The journals of the two houses of the General Assembly of 1891 may be referred to as a part of this finding.

The ballots used at said election were kept in the several towns in the ballot boxes for six months after the election,

as required by law, and after that time the boxes were opened and the ballots generally destroyed, or so manipulated as to be of no value for the purpose of ascertaining their number. The ballot boxes containing the ballots for state officers were kept sealed and intact in the following towns only, to wit, Bethlehem, Bridgeport, Columbia, Coventry, Cromwell, Danbury, East Lyme, Glastonbury, Harwinton, Middlefield, Morris, New Fairfield, Sherman, Stratford, and Thompson, and said ballot boxes from all of these towns were produced in court, identified and placed in the custody of the clerk of the court. No evidence was offered to prove, and no claim made, that the re-examination of the ballots in any of the ballot boxes above named, except in the towns of Bridgeport, East Lyme and Thompson, would in any particular vary or change the result of the count or state of the vote as shown by the counters' evidence and returns and the moderators' certificates, and neither party made any claim to have the boxes opened for any purpose, although the relator made the general offer to have them all opened for any purpose desired by the respondent. The court, therefore, saw no reason for opening the boxes except those from said Bridgeport, East Lyme and Thompson, or to re-count the ballots therein.

For the purpose of proving that said John J. Phelan, the relator, received an actual majority of all the votes cast at said election for the office of secretary, the relator offered the evidence of the sworn officials who actually made or participated in the count of the ballots in the several election districts, together with the counters' certificates made immediately after the completion of the count, in duplicate, and agreed to and signed by the counters participating in the count, and filed with and indorsed by the moderators of the electors' meetings in the several towns, and by them deposited, one in the ballot box and one with the town clerk of each town, to be kept on file pursuant to section 237 of the General Statutes.

This evidence was further supplemented by the moderators' returns and certificates of the vote for secretary, and

by the evidence of at least one witness who participated in the count and declaration of the vote in open meeting, and who testified that the figures for the different candidates for secretary, as shown in a tabulated statement presented, were either agreed upon without question by the sworn counters who participated in the count, or, if there was a question in regard to whether certain ballots should be counted, are the figures which the moderators in the several towns or districts determined in the exercise of their discretion under the law, and are the figures which were declared by said moderators in open meeting without question by those present at the time of said declaration.

The respondent made a general objection to the admission of all the evidence offered by the relator to show that he received an actual majority of the votes cast, and claimed that the ballots themselves were the only evidence by which such fact could be established; but the court overruled this objection and admitted the evidence.   The respondent excepted.

2. For the purpose of aiding the court in the process of ascertaining the result of the vote for the several candidates, counsel for both parties agreed that a committee might make the computation, and their count was agreed upon as showing the exact state of the vote as disclosed by the counters' returns and returns of the presiding officers produced in evidence from the several towns throughout the state. The tabulated statement of said committee in detail is annexed, and made part of this finding.   The recapitulation of this tabulation shows that the following persons received the number of votes annexed to their respective names for the office of secretary at said election in November, 1890 ; to wit:—John J. Phelan, 67,735 ; George P. McLean, 63,533; Henry R. Palmer, 3,423; Horatio H. Lane, 186 ; scattering, 46.   But I find from the evidence in this case that this statement of the vote should be corrected on account of clerical errors made by the moderator in his return of the count of votes in the town of Preston, by which John J. Phelan was certified as receiving 270 votes, when in fact he re-

ceived 290 votes in said Preston. I find also that the count of votes was erroneous in the towns of Norwich and Oxford, where a recount of the ballots was made by a committee composed of members of the republican and democratic parties, and errors found to have been made in the count. In Norwich there was an error of 23 votes found in the count, John J. Phelan having been returned as receiving 256 votes, when in fact he received but 233. In Oxford there was a mistake of the moderator in counting a democratic ballot for a republican ballot, by which one vote was counted for Phelan which should have been counted for McLean. I find, also, that 3 votes in the town of Portland tabulated as scattering, were cast and should have been counted for Horatio H. Lane.

These are all the claims made by either party as to actual errors in computing the result of the votes counted, and, making these corrections in the count, I find that there were actually cast in the several voting districts of the state the following number of votes which *primâ facie* should be counted for the following named persons respectively for the office of secretary, to wit:—For John J. Phelan, 67,731; for George P. McLean, 63,534; for Henry R. Palmer, 3,423; for Horatio H. Lane, 189; scattering, 43.

3. The claims of both relator and respondent as to the use of the word "for" upon certain ballots that were counted and certain ballots that were rejected and not counted in several towns, I dispose of before proceeding to other claims as to illegal ballots counted or rejected.

All the regular prohibition ballots cast had the word "for" prefixed to the name of every office. This word was not used or intended to be used as a distinguishing mark or to evade any provision of the law. I therefore find that, under the decision in *Fields* v. *Osborne*, 60 Conn. R., 544, said ballots were not invalidated by the use of the word "for" before the title to each office on the ticket, and so far as that claim is concerned were properly counted for Henry R. Palmer for secretary. There were 122 of these ballots rejected because the word "for" was thus used. I find

therefore that all these ballots were improperly rejected by
the moderators of the electors' meetings, so far as the use
of the word " for " thereon is claimed to invalidate them ;
and there being no claim that any of these ballots were other-
wise illegal, except in Brooklyn, Killingworth, Stratford,
and Waterbury, hereinafter referred to, I find that they
should be counted for Henry R. Palmer for secretary, and
therefore that his vote should be increased by the number
of 122 ballots, making his total vote 3,545 instead of 3,423,
as tabulated.

By the correction of actual mistakes made in the count as
before specified, and by counting said 122 prohibition ballots
improperly rejected, I find that upon the face of the returns
as verified by the counters, and other evidence in the case,
and thus corrected, John J. Phelan had a *primâ facie* ma-
jority over all other persons voted for at said election for
the office of secretary of 420 votes.   Included in this count,
however, are certain ballots which were counted for some of
the several candidates which the relator and respondent,
each for different reasons, claim were illegal ballots and
should not be counted, but should have been rejected and
excluded from the count.

After the relator had produced the evidence hereinbefore
stated, including the evidence of the counters, he rested his
case, claiming to have shown that he had a majority of the
votes cast for all persons for secretary.   Thereupon the re-
spondent produced evidence to show imperfections and ille-
galities in many of the votes counted for the relator in
various towns, and also that certain ballots that were rejected
should have been counted for the respondent.   The relator
thereupon offered in rebuttal evidence to show that many of
the same defects as those offered in evidence by the defend-
ant existed also in regard to certain ballots that were count-
ed for and which made up the total vote of all the other
candidates voted for for secretary, and especially in regard
to the industrial reform and prohibition ballots, many of
which ballots, as well as some others hereinafter especially
referred to, the relator claimed should not have been counted

for any of the other candidates on account of alleged illegalities in the ballots.

The respondent objected to the admission of this evidence as rebutting testimony, claiming that it was properly testimony which should have been offered in chief; but the court held that it was fairly, under the circumstances of this case, rebutting testimony; but even if it was not, the court, in the exercise of its discretion as to the order of the reception of evidence, and in order that all material facts affecting the case might be produced in evidence, allowed the evidence offered by the relator to be introduced. To this ruling the defendant excepted.

4. The relator claimed that certain folded or creased ballots in the towns of East Lyme and Sharon were illegal, because bearing a distinguishing mark. As to these ballots I find that in the town of East Lyme 10 votes were taken from the separate envelopes containing them, all folded precisely alike and in a strikingly unusual manner. The crease made by the force used in folding and pressing the ballots into the small compass in which they were folded, produced enduring and permanent marks of such a nature that when unfolded these ballots could readily be separated and distinguished from other ballots folded in the ordinary manner, and at a greater distance than if marked with a pencil or with ink. I find that these ballots were folded by the same hand, or under the direction of the same brain, and all were so folded before being deposited in the ballot-box.

There were other ballots of the same character in the town of Sharon, except that they differed as to the form of the fold. These ballots were so folded that they formed a capital letter "A," and were taken separately from the several envelopes containing them. The relator claimed that there were 19 ballots of this class counted in the town of Sharon; but I find that there were 13 of the Sharon ballots which were marked by folding in such a way as to be clearly and easily distinguished, and to which the finding in regard to the East Lyme ballots is equally applicable. Said ballots were folded as found before being deposited in the ballot-

box. The folded ballots in both East Lyme and Sharon were straight republican ballots, each of which bore the name of and was counted for George P. McLean for secretary, and if illegal and void by reason of such distinguishing marks 23 votes should be deducted from the total vote of said McLean.

5. In the town of New Haven there were counted 15 republican ballots, 11 in the second ward and 4 in the sixth ward, each bearing the name of said McLean for secretary, with each of which was found in the envelope containing the same a printed circular signed by the republican town committee, advising the voter to vote early, and giving the location of the voting place. If the presence of this circular in the envelopes with the ballots renders the ballots illegal under the law, as the relator claims, then I find that said 15 votes should not have been counted but should have been rejected, and should be deducted from the total vote of said McLean for secretary. There were also 4 straight republican ballots rejected in the sixth ward in said New Haven, each bearing the name of said McLean for secretary, and each found in an envelope containing a similar printed circular. If the presence of said circular in the envelopes with said ballots does not render the ballots illegal, then I find that said four ballots should not have been rejected, but should be counted for said McLean for secretary.

6. In the town of Goshen 9 republican ballots bearing the name of and counted for George P. McLean for secretary, had the printed name of the candidate for judge of probate erased with a pencil, and the names of different persons written in by the same hand on each of said ballots, in pencil, underneath. If such erasure and writing rendered the ballots illegal, then I find that the same should not have been counted for said McLean, but should have been rejected, and should be deducted from his total vote.

7. In the town of Kent 7 republican ballots with the name of George P. McLean for secretary thereon, had the name of the candidate for judge of probate erased with ink, and the name of Thomas D. Barclay written in underneath by

the same hand upon all said ballots, and such ballots were counted for said McLean. If such erasure and writing rendered such ballots illegal, then I find that said 7 votes, so counted, should have been rejected and should be deducted from said McLean's total vote.

8. In the town of Canaan there were 129 republican ballots bearing the name of George P. McLean for secretary counted for said McLean, which had the name of Jacob B. Hardenburgh erased in ink, and the name of J. Lee Ensign written in ink underneath. It appears that Canaan and North Canaan are in one probate district. In North Canaan Jacob B. Hardenburgh was nominated by the republican party for the office of judge of probate, while in Canaan J. Lee Ensign was voted for for the same office on the republican ticket. The ballots printed for use in North Canaan were like samples, and 129 of them were voted with the name of J. Lee Ensign upon them, as it appears in the samples. If such erasure of said Hardenburgh's name, and such writing in of the name of said Ensign, rendered such ballots illegal and void, as the relator claims, then I find that said 129 votes should have been rejected, and should be deducted from the total vote of said McLean.

9. In the town of Sterling 12 democratic ballots with the name of John J. Phelan for secretary thereon were cast and counted for said Phelan, which had the name of Marvin H. Sanger originally printed thereon under the words " Judge of Probate." Said Sanger's name was erased in pencil, and the name of David S. Kenyon written underneath. Said Sanger was not a resident of the Sterling probate district, but was a resident of the probate district of Canterbury; said Kenyon was a resident of Sterling, and a candidate of the democratic party for the office of judge of probate in the district of Sterling. If said original printing of the name of Marvin H. Sanger upon said ballots, or the subsequent erasure and insertion of the name of said Kenyon, rendered such ballots illegal and void, then I find that said ballots should have been rejected, and should be deducted from the total vote of said Phelan.

There was one straight democratic ballot in Sterling bearing the name of said Phelan for secretary, which had the name of said Marvin H. Sanger printed upon it as a candidate for judge of probate as originally printed upon all said ballots in Sterling, and which was not erased. Said ballot was counted for said Phelan for secretary. If said ballot was rendered illegal and void on account of having the name of said Sanger upon it, who was not a candidate or resident in said district of Sterling, then said vote should have been rejected, and should be deducted from the total vote of said Phelan.

There was also one straight democratic ballot cast in Sterling bearing John J. Phelan's name for secretary, and counted for said Phelan, which had the part of the ballot below the words "Judge of Probate" cut or torn off. If said cutting or mutilation of this ballot rendered the remainder of the ballot void and illegal, then I find that said vote should have been rejected, and one vote should be deducted from said Phelan's total vote.

In the town of Canterbury there were 13 democratic ballots cast bearing John J. Phelan's name for secretary, and counted for said Phelan, upon which the name of said David S. Kenyon, a resident of Sterling, was originally printed under the words "Judge of Probate." Said Kenyon's name was erased in pencil, and the name of Marvin H. Sanger was written in pencil underneath on seven of the ballots; the name of Washington Smith was written underneath on one of the ballots ; Kenyon's name was wholly erased in pencil on one, and the name of David S. Kenyon as originally printed remained on four of the ballots. If all or any portion of said ballots are found on account of these facts illegal or void, the number so found void should have been rejected, and should be deducted from Phelan's total vote.

10. In the town of East Hartford there were 9 prohibition ballots cast and counted with the name of Henry R. Palmer thereon for secretary, originally containing the name of Thomas H. L. Talcott printed thereon as a candidate for judge of probate, but two of which had said Talcott's name

erased and the name of John A. Stoughton written underneath in pencil. Said Talcott was not a regularly nominated candidate for judge of probate in the East Hartford district, nor did he reside in said district, but was a resident of the town of Glastonbury. If any of said ballots are void within the meaning of the law, then I find that such ballots should have been rejected, and the same should be deducted from the vote of Henry R. Palmer for secretary.

11. In the town of Hartland 60 democratic ballots with the name of John J. Phelan for secretary thereon were cast and counted for said Phelan, which were originally printed with the name of J. Hurlburt White as a candidate for judge of probate. Said White was not a resident of the district of Hartland, but a resident of Hartford, and a candidate for judge of probate for the district of Hartford. A printed paster bearing the name of Almon C. Banning, the regular nominee of the democratic party for judge of probate, was pasted over the name of J. Hurlburt White before said ballots were voted. Said ballots all contained also the name of Edward S. Cleveland as a candidate for senator. Said Cleveland was not a resident of the senatorial district in which the town of Hartland is located, nor a candidate of the democratic party in that district for senator, but was a resident of Hartford, and a candidate of the democratic party in the first senatorial district for the office of senator, and as such was voted for and elected. If said ballots were void and illegal by reason of having the name of J. Hurlburt White originally printed upon them, or by having a printed paster containing Banning's name placed upon them before being voted, or on account of having the name of said Cleveland upon them for senator, then I find that said 60 ballots should have been rejected and excluded from the count for secretary, and should be deducted from the total vote of said Phelan.

12. In the following towns [naming them,] I find that the industrial reform ballots bearing the name of Horatio H. Lane as a candidate for secretary, were originally printed without the name of any candidate for judge of probate upon

them, and that in the probate districts wherein said towns are situated no nominations for the office of judge of probate were made by that party. The number of said ballots cast was in the whole 164. All of these ballots were counted for said Lane for secretary. Some of them had a name for judge of probate either pasted by printed paster, or written in with a pencil or ink; but how many were either so pasted or written did not appear in evidence and cannot be determined. If these ballots were defective and void by reason of the blanks in the office of judge of probate, then I find that they should not have been counted, and should be deducted from the total vote of said Lane for secretary.

13. All the prohibition ballots cast at said election bearing the name of Henry R. Palmer for secretary in the following towns, [naming them,] were originally printed without the name of any candidate for judge of probate, and there were no nominations for the office of judge of probate by that party in most of the districts in which those towns are located. The number of such ballots cast and counted for said Palmer is 1474 in all. Of these ballots I find that there were actually cast in the several towns 544 which had a blank space under the words "For Judge of Probate" on the ballots. As to the balance of the 1474 ballots, I find that some had printed pasters containing names of candidates, and some names of candidates written in pencil or ink, and in one instance the name was printed with a stencil plate or rubber stamp in the blank space under the words "For Judge of Probate;" but it is impossible to determine from the evidence how many of each class of said ballots were so voted. If, by reason of said omission of the name of a candidate for judge of probate on said ballots, or by reason of names of candidates being written in said blank spaces upon the ballots in ink or pencil, or by said insertion of printed pasters, said ballots are void and illegal, then I find that all of said ballots, or such portion thereof, if any, as may be declared to be illegal and void, should have been rejected, and should be deducted from the total vote of said Henry R. Palmer for secretary.

14. I further find that in the following towns, [naming them,] the democratic party made no nominations for judge of probate, and the democratic ballots bearing the name of John J. Phelan for secretary, cast and counted for him for said office in all these towns, had no name printed under the words " Judge of Probate." The number of such ballots so voted was in all 853. All but five of these ballots were cast with a blank under the words " Judge of Probate." If by reason of such blanks these ballots are void and illegal, then I find that said 853 votes, or such number as are found illegal and void, should have been rejected and excluded from the count, and should be deducted from the total vote of said Phelan for secretary.

15, 16, 17. [The facts are similar to those of No. 14, and present the same question. If the ballots mentioned in them were to be rejected it would reduce the Phelan vote by 575 ballots.]

18. In the town of Litchfield the democratic ballots all had the name of John J. Phelan upon them for secretary, and also the name of Robert E. Deforest as a candidate for Congress. Upon the ballots as originally printed the letter " E " in the first syllable of the word Deforest was printed with a small " e," and said ballots were so distributed in the booths, and delivered from the booths to the electors on the day of election, until about 10 o'clock A. M., when it was suggested that such spelling of the word Deforest was an error; thereupon the democratic committee of Litchfield prepared printed pasters with the name of Robert E. Deforest spelled in the first syllable of the last name with a capital " E " (" ROBERT E. DEFOREST,") and pasted the same over the name of said Robert E. Deforest, as originally printed on the ballots, for the sole purpose of correcting the supposed error in the printing of the name on the tickets; and all the democratic ballots thereafter cast in said Litchfield had said printed pasters thereon. I find there were 247 of said ballots that had the Deforest paster over the name as printed. Forty of said ballots with the name of " DeFOREST " as originally printed were cast before

any of the pasters were used, and all said democratic ballots were counted for said Phelan for secretary. If any of said ballots are, by reason of such original printing, or by the use of said printed pasters, void and illegal, then I find they should have been rejected, and should be deducted from the total vote of said Phelan for secretary.

19. In the town of Lyme Benjamin A. Rathbun was a candidate nominated by the republican party for the office of judge of probate. The democratic party adopted the nomination of the republican party for that office, but in printing said Rathbun's name upon the democratic ballots it was printed Benjamin A. Rathburn. This mistake in spelling was discovered before any of the ballots were cast, and the democratic town committee, solely for the purpose of correcting the error in spelling, caused the "r" in the last syllable in the word "Rathburn" to be crossed out in ink, and 80 of said ballots, all bearing the name of said Phelan for secretary, were cast and counted for him. If said ballots, by reason of said erasure or crossing of the letter "r" in ink were illegal and void, then I find that said 80 votes should have been rejected, and should be deducted from the total vote of said Phelan for secretary.

20. In the town of Hartland four republican ballots, each bearing the name of George P. McLean for secretary, were originally printed with the name of Orton B. French as a candidate for judge of probate thereon. Three of these ballots when taken from the separate envelopes containing them had a printed paster, bearing the name of J. Hurlbut White pasted over the name of said Orton B. French, and also another printed paster, bearing the name of Almon C. Banning, pasted over the name of said J. Hurlbut White, on said first named paster, so that each of said three ballots had two printed pasters pasted over the name of said French as originally printed on said ballots under the words "Judge of Probate." The other of said four ballots had two names under the words "Judge of Probate," viz:—"Orton B. French" printed on the ballot, and "Miles B. Preston" written in pencil thereunder. All these ballots were counted

for said McLean for secretary.   If said three ballots by rea-
son of said double pasters, or said fourth ballot by reason of
having said two names under the words "Judge of Pro-
bate," or for any other reason, are rendered wholly void, or
if any of them are thereby rendered illegal so that they
cannot be counted for secretary, then I find said ballots
should have been rejected, and should be deducted from the
total vote of said McLean for secretary.

21. [Same general facts as in Nos. 15, 16 and 17.   The
ballots were prohibition ballots, and if rejected would reduce
the vote for Henry R. Palmer for secretary by 76 votes.]

22. The relator made no claim that any ballot cast for
him was improperly rejected, and I find that none were.
The returns of the counters' and the moderators' certifi-
cates were in many cases imperfect and defective; the forms
for statement of the vote and counters' returns and certifi-
cates of presiding officers, sent out from the secretary's
office, were the same style of form that had been used for
several years, and were not prepared or adapted for use
under the so-called secret ballot act of 1889.   A specimen
of said forms is attached hereto, and marked respectively
"Exhibits 10 and 11." *

The respondent made various claims as to the improper
rejection of ballots which he claims should have been count-
ed.   In the town of Bridgeport 126 straight republican
ballots, bearing the name of George P. McLean for secre-
tary, were rejected and excluded from the count by the presid-
ing officer in the fifth voting district of that town on account
of the claim that each of said ballots bore a distinguishing
mark or marks, and was therefore illegal and invalid under
the ballot law of 1889.   In regard to these ballots I find
the following facts :—The republican state ballots were all
printed at the Case, Lockwood & Brainard Company's print-
ing establishment in the city of Hartford, and under the

---

* NOTE.—The exhibits here referred to were as follows:—
EXHIBIT 10.
At a meeting of the Electors of the town of            , legally warned
and held on the Tuesday after the first Monday of November, A. D. 1890,

Phelan *v.* Walsh—Sanger *v.* Henry.

direction of the republican state committee were forwarded by that company to the chairmen of the republican town committees of the different towns throughout the state a few days prior to the election.   In printing the ballots twelve electrotype plates were employed.   The printing was of the cheaper grade of printing work, and was hurried, and printed

the ballots in the box marked " General Ticket" were counted with the following result:

|  | IN WORDS AT FULL LENGTH. | FIGURES. |
|---|---|---|
| Whole number of ballots | [ | ] |
| Number rejected for being in wrong box | [ | ] |
| Number rejected for being double | [ | ] |
| "      "      "   other causes | [ | ] |
| (State what) | [ | ] |

### NUMBER COUNTED FOR EACH CANDIDATE.

#### FOR GOVERNOR.

|  | NUMBER IN WORDS AT FULL LENGTH. | FIGURES. |
|---|---|---|
| Samuel E. Merwin | [ | ] |
| Luzon B. Morris | [ | ] |
| Phineas M. Augur | [ | ] |

[And so on for the other candidates voted for.]

### EXHIBIT 11.

Statement of Vote at a Meeting of the Electors of the town of legally warned and held on the Tuesday after the first Monday of November, A. D. 1890.

IN WORDS AT FULL LENGTH.

Whole number of names on registry list,.................................

Whole number checked as having voted,................................

Whole number not checked,............................................

#### NUMBER OF BALLOTS FOUND IN EACH BOX.

" General,".............  .................................................

" Representative,".....................................................

#### NUMBER OF BALLOTS NOT COUNTED.

For being in the wrong box............ { " General,"............  ..........................
" Representative,".................................

For being double,...... { " General,".........................................
" Representative,"...............................

For other causes,.*.... { " General,"...............................  .......
.....................................  ...............
........................................:...............
..................................................  ......

.............................*Presiding Officer.*

*State for what causes.

on a cheap class of paper made from wood pulp and containing some imperfections. About twenty thousand of these ballots, bearing the names of the republican candidates for state officers, among them the name of George P. McLean for secretary, were sent by the Case, Lockwood & Brainard Company to William H. Marigold, chairman of the republican committee of Bridgeport, a few days before the election. Mr. Marigold examined the ballots to see if the candidates' names thereon were correctly spelled, and while doing so noticed certain small glossy spots on the paper upon which the ballots were printed. These small spots of irregular shape and varying size, wherever found upon any of the 126 Bridgeport ballots in question, I find to be simply and only defects in the paper occasioned by some hard wood fiber in the wood pulp from which the paper was manufactured.

Mr. Marigold also noticed certain other marks, especially a mark between the letters "v" and "e" in the word "Governor," and his attention was called to the same the evening before the day of election, but he decided, as a practical printer for many years, that these marks were marks accidentally occurring, and not unusual in printed work of that class. His attention was not again called to the marks until about 9 P. M. on the evening of election day, when a question regarding the same was raised by one of the counters during the progress of the count in the fifth district in Bridgeport. After discussion the moderator decided that 126 of the straight republican ballots, all containing the name of said McLean for secretary, should be rejected and excluded from the count, on the ground that the marks were distinguishing marks which rendered the ballots illegal and void. These ballots are marked for identification as exhibits from 1 to 126 inclusive. The ballots from 1 to 82 inclusive contain a small mark between the letters "v" and "e" in the word "Governor." This mark, upon a superficial examination by the naked eye, by one not particularly familiar with the art of printing, might easily be mistaken for a mark made with writing ink by a pen. A close examination of the ballots with the aid of a microscope, and especially

the photographs of the marks as shown under the microscope, reveal conclusively the fact that none of the marks on any of the ballots marked from 1 to 122 inclusive were made with writing ink or with a pen, but that all were made with printers' ink. The marks are imprinted on the surface of the paper, the fiber of which is not broken. The marks present a ragged or serrated edge under the microscope. After the election was over several hundred ballots marked precisely like the ballots numbered from 1 to 82 and from 83 to 122 inclusive were found in Bridgeport and Meriden, and are now in court as exhibits.

From all the evidence in the case I find that the marks on these ballots numbered from 1 to 82 inclusive were made by a defect in one of the twelve electrotype plates used in printing the ballots, by means of which a small piece of the metal composing this particular plate was raised or projected upon the plate between the letters "v" and "e" in the word "Governor," which left a uniform mark in printers' ink upon each impression made by the plate upon any ballot in the process of printing. The defect in the plate was purely accidental, and was not discovered by the printers before shipping the ballots to Bridgeport; and the ballots were neither marked nor used for the purpose of identifying the voter who cast the same, nor with the intention of distinguishing them from other republican ballots cast at the electors' meeting.

The ballots marked from 83 to 122 inclusive all contain a mark between the letters "e" and "n" in the word "Lieutenant." This mark I find to have been made by a small piece of the composition of which the roller used in inking the electrotype plates is made, getting wedged in between said letters "e" and "n" in one of the electrotype plates, and thus leaving the impression found upon the ballots in printers' ink. This mark was an accidental mark occasioned by the neglect of the printers, and was not designed or used for the purpose of distinguishing these ballots from other republican ballots cast at the electors' meeting in said fifth district, or elsewhere in the town of Bridgeport.

Ballot Number 123 I find contains a minute puncture under the letter " T " in the word "LIEUTENANT," which appears to have been made, and which I find was made, by the sharp point of a lead pencil, and was taken from the envelope in this condition. This is the only ballot of the 126 that has a lead pencil mark upon it, and there is no evidence that any other ballot cast in said fifth district or elsewhere in the town of Bridgeport had a similar mark upon it.

Ballot 126 has a small mark under the letter " N " in the word " REPUBLICAN " at the head of the republican ticket. This mark I find was made with writing ink and pen. There was no evidence offered to show that any other ballot cast in said fifth district or elsewhere in the town of Bridgeport, had upon it a mark of the same kind; and I find that no other ballot of said 126 ballots cast in the fifth district of Bridgeport had upon it any mark whatever made with writing ink.

If, under the above facts, any or all of these ballots so marked as aforesaid are illegal and void, then such number as are found to be illegal and void were properly rejected. But if, under the facts found regarding the marks upon such ballots, any or all of them are found to be legal ballots, then such number so found legal I find were improperly rejected, and should be counted for and added to the total vote of said George P. McLean for secretary.

The marks on numbers 124 and 125 of said Bridgeport ballots I find to be simply defects in the paper upon which such ballots were printed, and that they are not distinguishing marks within the meaning of the law, and were therefore improperly rejected by the moderator, and should be counted for and added to the total vote of George P. McLean for secretary.

Counsel for the relator objected to all the evidence offered in reference to the 126 Bridgeport ballots, claiming that the action of the moderator of the electors' meeting in said fifth voting district of Bridgeport in rejecting said ballots and excluding them from the count, was final and conclusive;

but the court overruled the objection and received the evidence, the relator duly excepting.

23. In the town of Killingly 54 ballots, and one ballot each in the towns of Newtown and Thomaston, were rejected and excluded from the count because the envelopes containing them were indorsed by only one of the booth tenders instead of both booth tenders, as required by law. No evidence was offered to show for whom or for what party said ballots were cast that were so rejected, or whether said ballots contained the name of any candidate for secretary. I therefore find that they cannot be considered in this case for the purpose of affecting the count of ballots, or determining whether the relator had a majority of all the votes cast for all persons for secretary.

24. The evidence furnished by the face of the returns shows that in the town of Branford 11 ballots, and one ballot each in the towns of Hartford and Middletown, were rejected, and the reason for such rejection did not appear in the returns of the moderators or in the evidence before the court. No evidence was offered to show that either candidate's name for secretary was upon any of the ballots so rejected, and I therefore find that such rejected ballots cannot be considered in this case for the purpose of affecting the count of the votes for secretary.

25. In the town of Winchester 14 republican ballots were cast having pasters written in ink in the same handwriting, but with a different name on each paster, pasted over the name of George Austin Bowen, under the words "Lieutenant-Governor." All of the ballots were straight republican ballots, (except as so pasted,) but one, which had a printed paster with the name of John J. Phelan upon it, which was pasted over the name of George P. McLean and under the word "Secretary" on the ballot. I find that these ballots were rejected by the moderator for the reason that the written pasters, each having a different name as a candidate for lieutenant-governor, was a device for identifying the voter who cast each ballot, and was a distinguishing mark within the meaning of the law. In connection

with these ballots the relator offered the evidence of one John Scanlon, a voter living in the town of Winchester, and offered to prove by him that some one about the polls on election day had shown him a republican ballot having a written paster upon it similar to the pasters upon these 14 ballots, and had made an offer of money to him if he would vote one of said ballots so pasted. The witness could not testify that the paster was in the same handwriting or in the same position upon the ticket as the pasters upon said 14 ballots, nor could he identify either of the 14 ballots as one of the ballots offered to him to vote. Counsel for the relator claimed that the evidence showed or tended to show that the 14 ballots in question were purchased ballots, and that the written paster was a device arranged to enable the purchaser to prove that the purchased voter had fulfilled his corrupt agreement; but the court held that Scanlon's evidence could not affect the validity of the ballots in question, because it did not appear that he had ever seen one of them before, or that the ballot that was offered him had the same identical writing and marks upon it which appeared on each of said 14 ballots, and therefore excluded the evidence. The relator excepted. If said ballots, by reason of said written pasters or otherwise, are illegal and void, then I find they were properly rejected; but if the court shall hold that they are valid, then they were all improperly rejected, and thirteen votes should be added to the total vote of said McLean, and one to the total vote of said Phelan, for secretary.

26. The evidence of the counters' returns and moderators' certificates shows that in the different towns there were in all 509 ballots rejected and excluded from the count at said election for being double. The defendant claimed that the burden was on the relator to show by evidence outside of the returns that said rejected ballots were legally rejected by the moderators, and that otherwise the court should find that they were not legally rejected, and count the same for the purpose of estimating the total number of votes cast. In no case, except in the single instance of the town of

Enfield, did it appear for whom said rejected ballots had been cast, or that the name of either candidate for secretary was upon any of the ballots so rejected. The court overruled the defendant's claim, and declined to count the ballots so rejected as double, except the ballot in the town of Enfield hereinafter referred to. No evidence was offered to show that all of the ballots were not for different persons for the same office, and that the ballots were not therefore double ballots within the meaning of the law, and no evidence was produced before the court to show that for any reason any of said ballots were improperly rejected, except one ballot in the town of Enfield.

In Enfield two straight republican ballots, each bearing the name of George P. McLean for secretary, were found folded together in the same envelope. The moderator decided that both ballots should be rejected. This was an error. By the provisions of section 9 of the act of 1889, one of the ballots should have been counted and one rejected. I therefore find that 508 ballots so rejected by the moderators were properly rejected and excluded from the count, and that one ballot was improperly rejected, and should be counted for said McLean for secretary.

Upon the foregoing finding of facts the question whether the relator received a majority of all the votes cast for all persons for secretary, after rejecting the different classes of ballots which were illegally cast and counted, depends upon how many shall be rejected and how many counted under the decision of the Supreme Court of Errors; for the advice of which court all questions of law arising on the record, or that may be raised, as to what judgment shall be rendered herein, including all questions that may be made as to the admissibility of all testimony objected to by the relator or respondent, are, with the consent of all parties to the record, hereby reserved.

In the case of *State ex rel. Phelan* v. *Walsh, L. Harrison* and *H. Stoddard,* for the relator; *W. C. Case* and *C. J. Cole,* with whom was *H. C. Robinson,* for the defendant.

In the case of *State ex rel. Sanger* v. *Henry, L. Harrison* and *H. Stoddard*, for the relator; *A. P. Hyde* and *C. E. Gross*, for the defendant.

CARPENTER, J.   We propose to consider first those questions involving the construction of the act of 1889 relating to elections, known as the "Secret Ballot Act."  Two considerations have had weight with us in adopting this course: —First, the construction of that act is of immediate practical importance in view of the approaching elections, and there is a general desire that those questions should be authoritatively determined at an early day; and if the court should hold that it has no jurisdiction of these cases there might be some impropriety in proceeding to discuss and determine minor questions involved.  Secondly, if the views taken of those questions shall lead to the conclusion that it is not shown that any one has a majority of all the votes legally cast at the election in 1890, for either of the offices in dispute, both cases will be practically disposed of by the facts and must necessarily be dismissed, and we shall be relieved of the necessity of considering and determining some grave questions of constitutional law.  In taking this course we assume for the purposes of these cases that the court has jurisdiction, at least to the extent of inquiring into and determining the facts of the cases, whatever may be said as to the power of the court, in a certain contingency, and in the present state of things, to apply a remedy.  We therefore pass by, without discussion, the questions, first, whether the General Assembly lost its power to declare the result of the election on the second day of its session; second, if not, whether since that day, from any cause whatever, it has lost that power; and third, whether in any event the courts have, or can have, under the constitution any jurisdiction over that matter.  We purposely refrain from expressing any opinion upon any one of these questions, and wish to have it distinctly understood that they remain open questions.

The first step in ascertaining whether the relator received

a majority is to ascertain the whole number of votes cast. The returns, as made to the board of canvassers, shows the whole number of votes counted. With those returns, which for the sake of convenience we will call the constitutional returns, the statute requires certain other returns to be made, which we will call the statutory returns.

The statute, Gen. Statutes, § 240, is as follows:—" The presiding officer shall, with the certificate upon the result of the electors' meeting which he is required to send by mail to the secretary of the state, send to the secretary his certificate of the whole number of names on the registry lists, the whole number checked as having voted at such elections, the whole number of names not checked, the number of ballots found in each box, namely, 'general' and 'representative,' and the number of ballots in each box not counted as in the wrong box, and the number not counted for being double, and the number rejected for other causes, which other causes shall be stated specifically in the certificate."

It appears from the statutory returns that there were eleven ballots in the town of Branford, and one ballot in each of the towns of Hartford and Middletown, which were rejected, and the reason for such rejection does not appear in the returns of the presiding officers, and did not appear in the evidence before the court. Nor was any evidence offered to show that either candidate's name for secretary was upon any of the ballots so rejected. The court therefore held that such ballots could not be considered for the purpose of affecting the count of the votes for secretary.

If by this is meant that those votes could not be counted for either candidate, the course taken was manifestly correct. But if we are to understand, as we think we must, that those votes were not regarded in making up the whole number of votes cast, it is not so clear that it was right.

Under a plurality rule it is material only to count the votes of the two highest candidates. All scattering votes are practically disregarded. Under the majority rule all scattering votes are important and must be counted.

In this proceeding they were rejected because it did not appear for whom they were cast, or that they were in fact cast for any candidate for the office under consideration. We are inclined to think that that was not a sufficient reason for disregarding them. It will be borne in mind that this is a judicial proceeding for the purpose of ascertaining whether the relator received a majority of all the votes lawfully cast for the office he now claims in November, 1890; and whether he should have been declared elected in January, 1891. At the time the votes were counted, and at the time when the result should have been declared, these ballots were in existence, they could have been examined, and it could have been easily ascertained for whom they were cast. It is very clear that at that time, and at any time when the ballots were in existence, they should have been included in the whole number of votes cast. Is it not equally clear that the same rule should prevail now? Will lapse of time, the destruction of the ballots, the impossibility of proving for whom the ballots were cast, justify the court in applying a different rule, and proceeding upon a different principle, from the rule that must have been applied, and the principle that must have governed, when the same matter was under investigation by the constitutional authorities?

We have assumed, and we think rightly, that these ballots contained votes for some of the several candidates for secretary and treasurer. The ballots rejected were for state officers, or general ballots. The state ticket alone is the subject of investigation. If the ballots conformed to the statute, and we must presume that they did until the contrary appears, they contained the names of all the offices and of candidates for each office. Experience teaches us that, with hardly an exception, every man who votes the state ticket votes for all the offices thereon. There can be no presumption that these ballots were exceptions. The contrary presumption is so strong that hardly any one would hesitate to act upon it in matters of importance concerning his own private affairs.

We have not overlooked the fact that considering these

votes now will result, in effect, in counting them against the relator. It may be said that this is a hardship that the courts ought to avoid. But the hardship is more apparent than real. There can be no legal hardship in showing that a man is not constitutionally elected to an office. If these votes cannot now be considered in determining the whole number of votes cast, it will inevitably operate to the prejudice of others. It will certainly disfranchise all these voters. And that is a political evil of no small magnitude, to say nothing of the possibility that another may be deprived of the office. But whatever hardship there is in fact is a hardship that the court does not cause, and it is in no wise responsible for it. The responsibility lies at the door of another tribunal.

The relator, like any other party who assumes the burden of proof, must prove his case. If for any reason he fails to do so his suit fails. The burden is on the relator, and we do not think there is any legal presumption that will operate to change it.

If it appeared upon the face of the returns that the ballots were legally rejected it would have presented a different case. There is a presumption in favor of the legality of a transaction when it appears to have been done in compliance with the law; but there is no such presumption when it appears that the law was not complied with, and the courts can make no intendment in favor of its legality. The law requires that the cause for the rejection of a ballot " shall be stated specifically in the certificate." That duty was wholly omitted. The act of rejection is illegal on its face. There can be no presumption to sustain an illegal act. We are of the opinion that these votes should have been included in the whole number of votes cast. .

There were in the state 509 ballots rejected " for being double." The respondent claimed that under the act of 1889 that was not a legal cause for their rejection. Previous to that act the statute provided " that no double ballot for the same office * * * shall be counted." Sec. 238. By the act of 1889, sec. 9, it is provided that " if more than one ballot

for the same office shall be found in any envelope, and such ballots shall be for the same person, only one shall be counted; and if such ballots shall be for different persons for the same office, neither of such ballots shall be counted." That act also contains a repealing clause as follows :—" Sec. 16. All acts or parts of acts inconsistent herewith are hereby repealed." Thus the law was, at the last election, that no ballot could be lawfully rejected for being double unless it appeared that the several ballots in the same envelope were for different candidates for the same office. That fact, if it exists, being essential to a legal cause for rejection, must be "stated specifically in the certificate." On the face of the certificates therefore these ballots seem to have been illegally rejected.

The claim made by the respondent in each case, the answer of the court thereto, and the facts bearing upon the question, appear from the following extract from the record :—" The defendant claimed that the burden was on the relator to show by evidence outside of said returns that said rejected ballots were legally rejected by said moderators, and that otherwise the court should find that said ballots were not legally rejected, and count the same for the purpose of estimating the total number of votes cast. In no case, except in the single instance of the town of Enfield, did it appear for whom said rejected ballots had been cast, or that the name of either candidate for secretary was upon any of the ballots so rejected. The court overruled the defendant's claim, and declined to count said ballots so rejected as double, except the ballot in the town of Enfield, hereinafter referred to. No evidence was offered to show that all of said ballots were not for different persons for the same office, and that said ballots were not therefore double ballots within the meaning of the law, and no evidence was produced before the court to show that for any reason any of said ballots were improperly rejected, except one ballot in the town of Enfield. In Enfield two straight republican ballots, each bearing the name of George P. McLean for secretary, were found folded together in the same envelope.

The moderator decided that both ballots should be rejected. This was an error. By the provisions of sec. 9, chap. 247, of the public acts of 1889, one of the ballots should have been counted and one rejected. I therefore find that 508 ballots so rejected by the moderators in said towns were properly rejected and excluded from the count, and that one ballot was improperly rejected, and should be counted for said McLean for secretary." The same finding, with change of names, is in the other case.

On this single point we are not entirely agreed, but a majority are of the opinion that the court below took a mistaken view of the law. It depends mainly upon the question on whom was the burden of proof? The court manifestly held that it was on the defendant. The defense expressly claimed that the burden was on the relator to show that the ballots were legally rejected, and the finding is explicit that that claim was overruled. This same question arose on the preceding point. The difference is between giving no reason for rejecting the ballots, and giving a reason that is insufficient. The difference in principle is imperceptible. Much of the reasoning under that head applies equally well to this. We refer to it without repeating it.

The burden of proof generally was on the relator to prove that he received a majority of the legal votes. In respect to this particular matter, if the reason given was sufficient on its face, the relator might properly rest; and then it would have been incumbent on the defendant to show its illegality. If insufficient, then it was for the relator to meet it by showing that the votes were in fact rejected for good reasons; or that the ballots contained no vote for secretary, etc.; or that for some other reason the ballots should not be taken into account. Thus it seems to us very clear that the burden of proof to show the legality of rejecting these ballots rested on the relator. If so, the court was clearly wrong in holding upon no other evidence than the face of the certificates that the ballots were illegal and were properly rejected.

It is suggested that by the term "double ballot," as used

by the moderators, must be understood a ballot double in the sense that it must, by the terms of the act of 1889, be rejected. We cannot assent to that proposition. As the law stood prior to 1889 every ballot that was double must have been rejected. Not so with the act of 1889. Under that act no ballot can be rejected merely because it is double. If the two ballots are for the same candidates, one is to be counted as the *vote* of the person depositing the envelope. The other is not counted because it represents no voter and therefore is not a legal vote. Under the present statute there can be but one vote in one envelope. Surplus ballots are not votes, and do not vitiate, provided it can be known how the voter intended to vote. If the ballots differ the intention cannot be ascertained. Hence neither can be counted.

It may be said that these rejected ballots are the surplus ballots not counted when the envelope contained two or more ballots for the same candidates, and that therefore the votes of all these voters have been counted once. If that was so the course taken by the judge on the trial was clearly right. But we are unable to take that view of it. Manifestly the judge himself did not so regard it. If he had, that of itself would have been an all-sufficient reason for not counting the ballots now, and there would have been no occasion for him to resort to other reasons.

We do not think that section 240 of the General Statutes, as modified by the act of 1889, requires such ballots to be returned as "rejected." Section 240 only requires ballots to be returned when the voter has been disfranchised A rejected ballot implies that. Hence when his vote is counted no return is necessary. That accords not only with the letter of the statute, but with its reason and spirit as well. The act of 1889 does not change the object and purpose of the law. It still requires that rejected ballots only shall be returned, and then only when the voter loses his vote ; and that, as the law now stands, is only when the several ballots are for different candidates.

If we are right in our view of the law, (and of that we entertain no doubt,) and of our interpretation of the ballots

rejected " for being double," then clearly these ballots should have been counted. But if it be claimed that rejected ballots mean something different from what we have supposed, then we think it is reasonably certain that the most that can be said is, that it is doubtful whether they may not mean something else, and something that will show that they ought not to be counted. Concede for argument's sake that there may be such a doubt: then, we would ask, in the presence of such a doubt, has the relator established a clear title to the office, especially if counting these ballots would change the result? In either event must not the disposition of these cases be the same?

It was strenuously urged in the argument that it must be presumed that the doings of the moderators were regular and legal till the contrary appears. We have said that there can be no such presumption when it appears that they did not conform to the law. All facts essential to their jurisdiction to reject ballots must appear affirmatively. The court will presume none and supply no omissions by intendment. But suppose there is such a presumption. Then it is met and neutralized by another, namely, the presumption that every voter has conformed to the law and done no act which should deprive him of his vote. These two presumptions are incompatible; both cannot stand. It is more charitable to suppose that the moderators have made a mistake than that the voters have done some act by which they have incurred the penalty of temporary disfranchisement. We think the presumption in favor of the voter must prevail.

Before considering the objections to the different classes of ballots we desire to say a word generally concerning the statute of 1889, chapter 247. The first section prescribes the requirements of a valid ballot. In regard to this there is little room for construction. When the legislature has expressed its intention in unmistakable language that intention must prevail. But we are not expected to extend the scope of the statute by construction. As it is somewhat penal in its consequences a reasonably strict construction should be the rule. We are not at liberty to avoid a ballot

that is not within the expressed intention of the legislature. On the contrary, like all penal statutes, it should be limited by construction, if necessary, so as to prevent its application to cases clearly not within its equities.

The 9th section is less specific. It is left to those who enforce the law to determine what is a distinguishing mark. Here is a wide latitude for construction. The language is:—"If any envelope or ballot shall contain any mark or device so that the same may be identified in such a manner as to indicate who might have cast the same, it shall not be counted," etc. It does not require that it shall be proved that the mark was used to identify the voter. If it did it would practically nullify itself in many cases. A less degree of evidence may satisfy one that the mark was used to identify the ballot so as to indicate who might have cast the same.

It is not easy to define in general words a mark or device here intended. We may only make some suggestions that will aid us in applying the statute to particular cases.

The 12th section allows the voter to make some changes. Obviously such changes may be so made and used as to point out the voter. Accidents and mistakes may cause many ballots to be distinguished from others. In all such cases care should be used that the rights and convenience of the voter are not unnecessarily interfered with.

There are two classes of marks. One is where a plausible reason is or may be suggested for their existence consistent with honesty and good faith; the other, where no such reason can be suggested. The former will rarely be allowed to invalidate a ballot unless it appears that it was in fact used for corrupt purposes; the latter, unexplained, will generally be presumed to be for corrupt purposes.

We will now consider the cases in detail, using the numbers corresponding with the numbers of the paragraphs in the record.

2. The errors in the towns of Preston, Norwich, Oxford, etc., were properly corrected in the court below.

3. The legality of those ballots printed with the word

" for " prefixed to the name of the office, in the absence of any finding that they were so printed for the purpose of identification, etc., has been affirmed by this court. *Fields* v. *Osborne*, 60 Conn., 544. We have no occasion now to add to what we then said. Such of these votes as were counted were properly counted. Those that were rejected should now be counted.

4. The folded or creased ballots in the town of East Lyme were all folded precisely alike, and in a strikingly unusual manner. The crease made by folding produced enduring and permanent marks of such a nature that when unfolded these ballots can readily be separated and distinguished from other ballots folded in the ordinary manner, and at a greater distance than if marked with a pencil or with ink. These ballots were folded by the same hand, or under the direction of the same brain, and before being deposited in the ballot-box. There were similar ballots in the town of Sharon. It is difficult to imagine any legitimate purpose for which these ballots could have been so folded. They should be rejected.

5. In New Haven there were nineteen republican ballots, with each of which were found in the envelope a printed circular from the republican town committee, advising the voter to vote early, and giving the location of the voting place, etc. There are so many of these votes as to preclude the idea that they were the result of ignorance, accident or mistake. That leaves the presumption pretty strong that the circulars were there by design. If by design, it is difficult to conceive of any honest motive in it. We think these votes should be rejected.

Paragraphs 6th to 17th inclusive may be considered together. They relate mostly to alterations in the ballots in respect to the office of judge of probate. In some instances ballots designed for one probate district were by mistake sent to another district. The tickets of the industrial reform, the prohibition, and in some instances of the democratic party, were printed without the name of any candidate for judge of probate. These tickets were generally voted. In

many ballots the name of the candidate for judge of probate was erased and the name of another written in its place, either with a pencil or with ink. Sometimes a printed paster was used and sometimes one written with a typewriter. When the name was left a blank the blank was filled in a similar manner. And generally the ballots were changed so as to adapt them to the town where used and to the views of the voter.

We do not think that the tickets issued with the name of no candidate for judge of probate were thereby invalidated. In every instance we can see that the party had a plausible reason for it consistent with good faith; so that there is no occasion to resort to an inference that they were designed for improper purposes. The party may have made no nomination; the ballot may have been printed before the nomination; or some other reasonable cause may exist. It is expected, doubtless, that the whole ticket will ordinarily be printed. But if any part is omitted, apparently for good cause, the question is whether the legislature intended that the ballots should thereby become void. The statute does not say so in terms. It prescribes the general requisites of a ballot, and then provides that if it does not conform thereto it shall be void. To hold that such an omission as this makes it void, would be to extend the statute somewhat beyond the letter and clearly beyond its spirit, which is hardly allowable in a statute penal in its nature. The changes to make the ballots sent to the wrong towns conform to the towns where used are allowable. They consist mainly, if not entirely, in erasing names and substituting others. It was done under that part of the twelfth section allowing a voter to erase, interline, and use a paster. That section was designed to alleviate the otherwise rigid features of the statute and is remedial. As such it should receive a liberal construction. Hence if a man may erase and insert he may procure others to do it for him, or he may adopt the act of others after it has been done. If he may erase and insert he may fill a blank. These are all acts of the same nature as the acts which the statute expressly per-

mits. Hence they are within the spirit of the statute. A construction that would limit this section to the thing expressed would be unusual and we think unwarrantable.

Using ballots sent to wrong towns, with names of candidates thereon who were ineligible by reason of non-residence, did not vitiate. In *Fields* v. *Osborne*, 60 Conn., 544, ballots were used at a town election having the office of judge of probate thereon and the name of a candidate. This court held that the ballot was illegal. The extraneous matter was foreign to the ballot. A judge of probate could not be elected at an election for town officers, and the office of judge of probate and the name of a candidate for that office had no place on the ticket. It was therefore matter in excess of the express requirements of the statute and was in terms prohibited. Here the ballot was in the usual form and contained nothing foreign to it. The men named as candidates did not reside in the district, but that did not appear on the face of the ballot, and in law does not make the ballot void.

There was one ballot in the town of Sterling, counted for the relator, which had the part of the ballot below the words "judge of probate" cut or torn off. That ballot did not conform to the statute. The statute makes it void and it should not have been counted.

18. In the town of Litchfield the democratic ballots were printed with the name of Mr. DeForest, the candidate for congress, in capital letters, with one exception, as follows ;— "ROBERT E. DeFOREST." These ballots were used at the polls until about 10 o'clock, when it was suggested that the ballots were wrong. Thereupon the democratic committee, for the sole purpose of correcting the supposed error, had pasters printed changing the small " e " to a capital of the same size with the other letters and pasted them over the name as originally printed. After that 247 of those ballots were cast and 40 were cast before. All were counted for the relator.

We have no doubt that they were properly counted. The first section of the act requiring type of uniform size was

strictly complied with in all other respects.  In that there was a violation of the strict letter of the law, but it was not a violation of its spirit and intent.  We do not feel justified in throwing out votes for such a cause.  It is a matter of common knowledge that this name, and many others of like character, are often, if not usually, printed in a similar manner.  We cannot believe that the legislature intended to prohibit it in such cases.  We cannot impute to it an intention to interfere with the ordinary mode of writing or printing a name.

The ballot as first printed was a substantial compliance with the statute, and the amendment, though unnecessary, was fairly justified by the twelfth section.

19.  One Rathbun was the republican candidate for judge of probate in the district of Lyme.  The democrats adopted the nomination, but in printing his name spelled the last syllable with an " r."  The mistake was discovered and the " r " erased in ink.  In that condition the ballots were used by the voters.

Bad spelling does not vitiate; correcting it ought not to.  The transaction carries on its face the explanation, which is consistent with the honesty of the voters, and there is no ground for supposing that it was designed for the purpose of identification.  Nor is it additional matter within the prohibition of the first section of the statute.  The ballots were properly counted.

20.  There were four republican ballots in the town of Hartland with the name of Orton B. French, as candidate for judge of probate, printed thereon.  Three of them had two pasters over the name of French, one of them containing the name of J. Hurlbut White, and the other the name of Almon C. Banning.  White resided in Hartford, and was a candidate for judge of probate in the Hartford district.  That three ballots should be treated in precisely the same very unusual way is a circumstance that requires explanation; as none is given, and as we can imagine no honest one that can be given, we must regard them as within the prohibition of the ninth section.  The other of said four

ballots has the name of Miles B. Preston written in pencil under the name of said French. That is within the prohibition of the first section. All said ballots should have been rejected.

22. Of the 126 ballots rejected in the town of Bridgeport, for the reason that they had thereon marks which were supposed to have been for the purpose of identifying them, 124 should be counted, as it now appears that the supposed marks were accidentally caused in printing.

25. Fourteen republican ballots in the town of Winchester were rejected because they had pasters written in ink, in the same handwriting, but a different name on each paster, pasted over the name of the candidate for lieutenant-governor. One of these ballots had the name of the relator on it pasted over the name of the opposing candidate. We are inclined to think that it was competent for the moderator to find that said pasters, each having a different name as a candidate for lieutenant-governor, written in the same handwriting, was a device for identifying the voter who cast each of said ballots, and was a distinguishing mark within the meaning of the law. Certainly no satisfactory explanation of the suspicious circumstances appears, and we cannot say that the action of the moderator was wrong or unjust.

The Superior Court is advised that the ballots rejected by the moderators, giving no reason therefor, and those rejected for being double, should be counted in estimating the whole number of votes cast.

That the errors in the count should be corrected.

That the " For ballots," so called, should all be counted.

That the folded or creased ballots in East Lyme and Sharon should be rejected.

That the ballots found in the envelopes with printed circulars should be rejected.

That all the ballots referred to in paragraphs six to seventeen inclusive should be counted, except the mutilated ballot in the town of Sterling, which should be rejected.

That the 287 ballots referred to in the town of Litchfield are legal and should be counted.

That the ballots in the town of Lyme, in which the letter "r" in the last name of the candidate for judge of probate was erased, are legal and should be counted.

That the four ballots described in paragraph twenty should be rejected.

That 124 of the 126 ballots rejected in the town of Bridgeport should be counted.

That the fourteen ballots in the town of Winchester, rejected by the moderator for the reason stated in paragraph twenty-five, were properly rejected.

In this opinion ANDREWS, C. J., and TORRANCE, J., concurred.

SEYMOUR and FENN, Js., filed together the following dissenting opinion.

We cannot concur in that portion of the opinion of the majority of the court which holds that the Superior Court, in ascertaining the whole number of votes cast for secretary at the election of November, 1890, should have counted the five hundred and nine ballots which the evidence of the counters' returns and moderators' certificates shows were rejected and excluded from the count for being double.

It was the duty of the relator, under the allegations of his information, to prove that he received a majority of the votes cast at the election. In discharge of that duty it is found that he introduced " the evidence of the sworn officials who actually made or participated in the count of the ballots in the several election districts of the state, together with the counters' certificates made immediately after the completion of the count in duplicate, and agreed to and signed by the counters participating in the count, and filed with and indorsed by the moderators of the electors' meetings in the several towns, and by them deposited, one in the ballot-box and one with the town clerk of each town, to be kept on file pursuant to section 237 of the General Stat-

utes." It is further found that " this evidence was further supplemented by the moderators' returns and certificates of the vote for secretary, and at least by the evidence of one witness in each case who participated in the count and declaration of the vote in open meeting, and who testified that the figures for the different candidates for the office of secretary, as shown in the tabulated statement attached to the finding, were either agreed upon without question by the sworn counters who participated in the count, or, if there was a question in regard to whether certain ballots should be counted, are the figures which the moderators in the several towns or districts determined in the exercise of their discretion under the law, and are the figures which were declared by said moderators in open meeting without question by those present at the time of said declaration."

The evidence of the counters' returns and moderators' certificates shows, among other things, that there were in all 509 ballots rejected and excluded from the count in the different towns for being double.

The finding states that " the defendant claimed that the burden was on the relator to show by evidence outside of said returns that said rejected ballots were legally rejected by said moderators, and that otherwise the court should find that said ballots were not legally rejected, and count the same for the purpose of estimating the total number of votes cast. In no case, except in the single instance of the town of Enfield, did it appear for whom said rejected ballots had been cast, or that the name of either candidate for secretary was upon any of the ballots so rejected. The court overruled the defendant's claim, and declined to count said ballots so rejected as double, except the ballot in the town of Enfield, hereinafter referred to. No evidence was offered to show that all of said ballots were not for different persons for the same office, and that said ballots were not therefore double ballots within the meaning of the law, and no evidence was produced before the court to show that for any reason any of said ballots were improperly rejected, except one ballot in the town of Enfield. In Enfield two

straight republican ballots, each bearing the name of George
P. McLean for secretary, were found folded together in the
same envelope. The moderator decided that both ballots
should be rejected. This was an error. By the provisions
of section 9, chapter 247, of the public acts of 1889, one
of said ballots should have been counted and one rejected.
I therefore find that 508 ballots so rejected by the modera-
tors in said towns were properly rejected and excluded from
the count, and that one ballot was improperly rejected, and
should be counted for said McLean for secretary."

We think that the ruling of the Superior Court in this
behalf was correct. Upon general principles there is, of
course, no reason for requiring the relator to justify in
advance the rejection of the 509 ballots by evidence outside
of the returns, which does not equally apply to the Bridge-
port ballots, and, indeed, to all the other rejected ballots
which were in dispute and which the finding states that the
defendant, after the relator had rested his case, produced
evidence to show were improperly rejected and should have
been counted for the defendant.

The conclusion that evidence outside of the returns is
necessary in respect to the 509 ballots before such returns be-
come even *primâ facie* evidence, is based upon the claim that
the statement of the respective certificates that the ballots
were rejected "for being double" is not a sufficient state-
ment of the reason for their rejection, and that therefore
they stand precisely as if no reason for rejection had been
stated. It seems to us that any careful examination of the
statutes, as they were before and after the election law of
1889 was passed, will show that such claim has no founda-
tion whatever to support it. The law which was in force
when the act of 1889 concerning elections was passed, de-
fined a double ballot as consisting "of two or more pieces
of paper upon which are duplicated or repeated the names
of one or more candidates for the same office." It provided
that no double ballot for the same office should be counted;
and that if any ballot should contain a greater number of
names for any office than is provided by law, it should not

be counted for any person for such office. The act of 1889 provides that "if more than one ballot for the same office shall be found in any envelope, and such ballots shall be for the same person, only one shall be counted; and if such ballots shall be for different persons for the same office, neither of such ballots shall be counted."

The law requires that the moderators of the respective meetings "shall decide, in case of doubt or dispute, as to the reading of a ballot, or whether a ballot should be rejected as double or for any other cause: that all ballots rejected for being in the wrong box, for being double, or containing an excess of candidates, or for any other cause, shall * * * be preserved in a separate parcel * * * and returned to the box with the valid votes." The law further requires the ballot-boxes to be locked and sealed after the ballots are counted and returned to them, and to be carefully preserved with the seal unbroken for six months, except in case of an official examination.

It is the duty of the respective presiding officers of the electors' meetings to send to the secretary, with the certificate of the result of the electors' meeting which he is required to send by mail, his certificate also of "the number of ballots in each box not counted as in the wrong box, and the number not counted for being double, and the number rejected for other causes, which other causes shall be stated specifically in the certificate."

Such being the law, it appears that in the state 509 ballots were rejected by the several moderators as being double, and a proper certificate was returned to the secretary to that effect. The finding states that the ballots used at the election were kept in the several towns, in the ballot-boxes, for the six months after the election, as required by law, and after that time, except in fifteen towns named, the boxes were opened and the ballots generally destroyed, or so manipulated as to be of no value for the purpose of ascertaining their number.

The finding states that no claim was made that a reexamination of the ballots, in any of the ballot-boxes of the

fifteen towns in which they had not been opened and the ballots destroyed or manipulated, would, in any particular, vary or change the result of the count or state of the vote, as shown by the counters' evidence and returns and the moderators' certificates, except in the towns of Bridgeport, East Lyme and Thompson, and in those towns upon other points than the double ballots. The court therefore saw no reason to open, and did not in fact open the boxes except from these three towns, although the boxes from all the fifteen towns were in court and the relator made the general offer to have them all opened.

The statute (General Statutes, § 237,) requires the counters to deliver to the moderator immediately after the count is completed, " a certificate in duplicate stating the whole number of ballots found in their box, the number of ballots rejected because in the wrong box, the number rejected as double, the number rejected for any other reason, and the number of votes counted for each candidate and office respectively." This is a clear and explicit statement of what the certificate shall report in respect to rejected votes. If rejected for being double the certificate shall so state. So if rejected for being in the wrong box, and if.rejected for any other reason, that reason shall be stated. " Rejected as double " is the formula which the statute itself provides when ballots are rejected for being double.

The requirement that the number of ballots rejected " for any other reason " than the reasons already stated, necessarily implies that certain reasons have been already required to be stated when they exist, and that they are reasons which, when stated in the terms of the statute, fulfill its requirements. In short, the statute treats " for being double " as a sufficient reason to be stated in the certificate, and, in terms, requires it to be given as the reason when ballots are rejected, not for being in the wrong box nor for any other reason. The provision, in section 240 of the statutes, requiring that, when the ballots shall be rejected for any other cause than for being in the wrong box, or for being double, such " other cause shall be specifically stated," shows that

"for being in the wrong box" and "for being double" are regarded in the statute as being specific statements of the cause of rejection. What better could the moderators do than follow the plain instructions of the law? Was it for them, in each instance of rejection, to add to its requirements, and state whether it was a case where more than one ballot for the same office was found in the envelope, or a case where more than one ballot was found for different persons for the same office, any more than it would be their duty to state into which of the wrong boxes a ballot, rejected for being in the wrong box, was placed when, as at a town election, more than two boxes were used?

To so hold seems to us to do violence to the ordinary rules of statutory construction, and to make the law a snare to catch moderators: the statute instructing them, in explicit terms, to do one thing, and the courts, by a construction of those unambiguous directions, requiring of them to do other things in addition, upon the penalty of otherwise defeating the election.

It is certain that when the secretary, acting pursuant to section 241 of the statutes, transmitted to the town clerks of the several towns, before the biennial electors' meeting in 1890, blank forms for the returns required to be made, such was not the construction placed upon the law by that official; for the record discloses that all those forms contained "for being double," as the ground of rejection to be stated in the returns when it existed.

That this fact should have some weight in the construction of the law is manifest. In *Fields* v. *Osborne*, 60 Conn., 551, this court gave weight, in determining upon the validity of the "for" ballots, to the fact that the secretary, in an unofficial notice, sent to every postmaster, town clerk and chairman of democratic and republican committees, a form of ballot containing the word "for" before the title of every office named therein. Contemporary construction of the law by those whose duty it is to act under it has ever been regarded as entitled to consideration. *Yudkin* v. *Gates*, 60 Conn., 429, and cases therein cited. Again the

statute, in section 241, not only requires the secretary to transmit forms for returns, but it also expressly requires that "said returns shall be made out, certified and directed according to such forms." This seems to us an additional reason for declining to hold that, when the mandate of the law has been complied with, every return throughout the state, so made in compliance therewith, must be held presumptively void, and that "on the face of the certificates the ballots rejected 'for being double' seem to have been illegally rejected." Upon every principle official forms for ballots or returns which have been relied upon and used should be upheld unless cleary illegal. Election laws, especially as regards the duties of the officials to whom the conduct of elections is intrusted, should be as simple and plain as possible. The officials should be held to a compliance with their provisions without adding thereto or abating therefrom. Any construction which adds to the stated provisions of the law, and requires the officials to go beyond them, is fraught with mischief and will open the door to endless contentions. The situation then is this :—The moderators of some of the electors' meetings decided that certain ballots must be rejected as double. The ballots so rejected were indorsed and preserved, in accordance with the statute, in the box with the valid votes. The counters upon the completion of the count delivered to the moderator a certificate in duplicate containing the statutory statements, and, among others, the statement of the number rejected as double. The moderators sent to the secretary, in connection with the certificate required of the result of the electors' meetings, a certificate containing, among other things, a statement of the number of ballots not counted for being double. The returns required by law are duly made. The votes as returned are counted by the legal canvassers. A full list of the persons and number of votes given for each, together with the returns of the presiding officers, is laid before the General Assembly. The General Assembly neglects to act, either by declaring the person whom they legally find to be chosen and giving him notice

accordingly, or by proceeding on the second day of its session, as is provided when no person is duly elected, to choose a secretary. Months elapse. The last incumbent of the office is holding over under the provisions of the law, though not a candidate at the elections of 1890, and not claiming to have been elected at that election. The relator brings an information in the nature of a *quo warranto*, in which he claims to have received a majority of the votes cast for secretary at the last named election. It is insisted that he has not shown that he had such a majority, because he has not proved, in addition to his other evidence, that the votes rejected as double were legally rejected ; that he must justify in advance the decision of the several moderators in rejecting the 509 ballots, and that there is not only no presumption in favor of the regularity of the official decisions, count and returns, but a presumption against them. For the defendant, after stating the differences between the old law and the present law of 1889 in regard to the treatment of double ballots, and after showing that under the old law both of the double ballots were to be rejected, while under the present law, if more than one ballot for the same office shall be found in any envelope, and such ballots shall be for one person, one shall be counted, says :—" If the statement of these certificates " (that is, that the rejected ballots were rejected for being double,) " is to be taken without explanation, the clear inference is that ballots were summarily rejected for the reason that they were double, in conformity with the law as it was before 1889." Which is to say that the clear inference is that the officials appointed and acting under the law of 1889 were either ignorant of its provisions or willfully disregarded them, and acting under the old law rejected both ballots where more than one for the same office and the same person were found in one envelope. We have not so understood the law respecting the presumptions arising from official acts.

The whole matter seems to us plain and easily stated. This court held in *State ex rel. Morris* v. *Bulkeley* that the information was insufficient, upon demurrer, in not alleging

that the relator had a majority of all the votes, but only the majority as it appeared by the returns of the presiding officers, while other parts of the information showed that such apparent majority was in dispute. The relator in that case went upon the theory that in court upon an information in the nature of *quo warranto*, as well as in the General Assembly, the official returns could not be contradicted or questioned, but were conclusive. He claimed, in effect, that under the admission of the demurrer that the returns showed him to have a majority of the votes, he was, so far as that point was concerned, and if that was the only question in the case, entitled to a judgment in his favor. But this court said that, while the writ of *quo warranto* is the form of action specially adapted to try the right to an office, yet it tries only the real title, and can never be used to try a merely apparent title. That is to say, the admission of an allegation in a *quo warranto* information, that the returns show that the relator had a majority of the votes cast, does not of itself entitle him to a judgment. In the courts the returns, when offered in evidence, are not exempt from examination, to test, and contradict, if it does so, their correctness.

But this is very far from saying that if they are subjected to no examination they prove nothing. The inherent unsoundness of such a proposition will we think be apparent upon a consideration of the situation. In an information like the one under discussion the relator *must* aver, among other averments, as the foundation of his proceeding, in substance, that upon a day named an election for state officers was held, as required by the constitution, and that he was one of the persons voted for at said election for secretary; that the lists of persons voted for at the meetings of the electors, in the respective towns of the state, so held for such purpose, and of the number of votes at such meetings given for each, were made and certified by the proper officers, and were by such officers transmitted, together with the returns of said election, to the secretary, and that the votes so returned showed that he had a majority of all the

votes cast for secretary at such election. No lawyer would venture to omit such averments from an information. Nor would he venture to rest his case without proving such of them as were denied and were not of a character to be judicially noticed. The facts averred are a part of the election process.

After he has proved that the legal returns give him a majority of the required votes, that the processes of election, so far as they have been exercised, show that he is entitled to a declaration of his election, has he proved nothing which it requires counter proof on the part of the defendant to over-throw? Must he justify, before any evidence is offered to impeach them, the decisions of the officials to whom the law entrusts the conduct of elections? Would any one contend, has it been intimated in the trial of this case, that, in addition to the averments above suggested as necessary to an information like this, it should be added that all the decisions of said moderators and other officials were correct and in strict compliance with the requirements of law, or is that assumed until the contrary is at least suggested?

To hold that it will not be assumed seems to us to contradict all the rules respecting the presumptions which the law makes, and should make, in favor of official acts, and to cast a burden upon the relator which it is not his duty to bear. The law places the duty upon the moderators of *deciding* whether certain ballots should be rejected as not conforming to the statute. If they do not so conform they are not valid ballots under the law, and cannot be counted in estimating the number required to constitute a majority. The moderators decided that 509 ballots in different towns did not conform to the law and they were not counted. The Superior Court declined to assume, in the absence of any attempt to impeach the action of the moderators or of the counters of the returns, that the ballots were improperly rejected, or that the burden was on the relator to support the correctness of the official returns until they were attacked. We think the action of the Superior Court was

correct, and should be sustained upon principle and authority alike.

Taylor, in his work on evidence, places the presumption stated in the maxim "*omnia præsumuntur rite acta esse,*" and which he says is one of the most important presumptions known to the law, among what he calls disputable presumptions, or presumptions which, while sufficient to establish a *primâ facie* case and to throw the burden of proof on the other party, may always be overcome by opposing proof. He gives many instances of the application of this presumption to acts of an official and of a judicial character. High's Extraordinary Legal Remedies, § 638, says:—"It is now the well-established doctrine that in proceedings upon information to test the title to a public office the return or certificate of canvassing officers as to the result of the election is not conclusive as to the result of the title to such office. Such officers are, in general, held to be only ministerial officers, vested with no judicial functions whatever, and their return is, at the most, but *primâ facie* evidence in favor of the incumbent of the office. The courts will therefore go behind such returns, and will investigate the facts of the election, the number of votes cast, and the legality of the action of the canvassers. For this purpose they may receive testimony and make all needful investigation to determine the question in dispute, and if satisfied that the proceedings of the canvassers are erroneous, judgment of ouster will be given." Was there any evidence in this case to satisfy the court that the proceedings of the officials were erroneous, except in the case of the two Enfield ballots? Judge COOLEY, in his work on Constitutional Limitations, 5th edition, p. 785, says :—" As the election officers perform for the most part ministerial functions only, their returns and the certificates of election which are issued upon them are not conclusive in favor of the officers who would thereby appear to be chosen, but the final decision must rest with the courts. * * * Where however the question arises collaterally and not in a direct proceeding to try the title to the office, the correctness of the decision of the

canvassers cannot be called in question, but must be conclusively presumed to be correct. * * * The most important question which remains to be mentioned relates to the evidence which the courts are at liberty to receive and the facts which it is proper to spread before the jury, when an issue is made upon an election for a trial at law. * * * We have already seen that the certificates or determinations of the various canvassing boards, though conclusive in collateral inquiries, do not preclude an investigation by the courts into the facts which they certify. They are *primâ facie* evidence, however, even in the courts, and this is so notwithstanding alterations appear. But back of this *primâ facie* case the courts may go, and the determinations of the state board may be corrected by those of the district boards, and the latter by the ballots themselves when the ballots are still in existence and have been kept as required by law. If however the ballots have not been kept as required by law and surrounded by such securities as the law has prescribed with a view to their safe preservation as the best evidence of the election, it would seem they should not be received in evidence at all, or if received it should be left to the jury to determine, upon all the circumstances of the case, whether they constitute more reliable evidence than the inspector's certificate, which is usually prepared immediately on the close of the election, and upon actual count of the ballots as then made by the officers whose duty it is to do so."

It is stated in volume 6 of American & English Encyclopedia of Law, p. 335, that "the returns when regular and properly authenticated are not only conclusive upon the board of canvassing officers, as we have seen, but are also *primâ facie* evidence of the number of votes cast in a proceeding to contest the election, and the burden of proof is upon the person who assails their correctness." See also the opinion of COMSTOCK, C. J., in *The People* v. *Minck*, 21 N. York, 541; also *The People* v. *Cook*, 8 N. York, 67; and cases cited in Cooley's Constitutional Limitations, *supra*.

We have laid no stress in this opinion upon the require-

ment of our statute that the moderator shall "decide" whether a ballot shall be rejected as double or for any other cause. If the function he performs of thus deciding is ministerial only and not judicial, yet the authorities already referred to abundantly support the position to which a consideration of the legal principles involved seemed irresistibly to lead, namely, that the returns and certificates which were introduced were to be taken as correct until attacked, and that the 508 ballots, against the legality of rejecting which no proof was offered, could not be counted in ascertaining the number of votes cast for secretary at the last election.

It is suggested in the opinion of the majority of the court, that, even if such a presumption in favor of official acts exists, yet in this case it is met and neutralized by the presumption that every voter has conformed to the law and done no act which should deprive him of his vote. We do not understand that such presumption has ever been held to neutralize the presumption arising from official acts. But in this case we submit that no such presumption exists. It was not claimed at the trial, nor on the argument before us, that there were not 509 cases where the voters had, in fact, failed to conform to the law by depositing ballots which violated some one of its provisions. The contention was, not that the voter had observed the law, but that the moderator had failed to sufficiently particularize which provision of the law against double ballots had been violated.

The conclusions to which we have come in this case apply with equal force to the case of *State ex rel. Sanger* v. *Henry*, which was argued in connection with it. And for the reasons herein stated, we think that the action of the Superior Court in that case also, in declining to count the ballots rejected by the moderators as double, except the ballot in the town of Enfield, was correct and should be sustained.