THE ATTORNEY GENERAL, EX REL. HENRY M. REYNOLDS, v. WILLIAM MAY.

[See 94 Mich. 505; 97 Id. 568.]

*Elections—Mandatory provisions of law—Marking ballots—Oath of elector—Apportionment of illegal votes—Quo warranto.*

1. This is a *quo warranto* proceeding to test the right of the relator to an elective office, into which the respondent has been inducted. And it is held:

   *a*—That the jury were properly instructed that, if they were able to separate the legal from the illegal votes, they should deduct the latter from the total vote proportionately, according to the entire vote returned for each candidate.

   *b*—That an instruction to throw out the vote of an entire district in which illegal votes were cast, instead of making

such deduction and apportionment, was harmless. if erroneous, as the result would have been the same if such illegal votes had been deducted and apportioned.

c—That the relator had the burden of proof to establish his right to the office, and was entitled to the opening and closing in putting in the proofs and in the argument to the jury.

2. Act No. 190, Laws of 1891, entitled "An act to prescribe the manner of conducting and to prevent fraud and deception at elections in this State," is construed as follows:

a—The act was passed to preserve the purity of elections, and guard against abuses of the elective franchise; and, although its enforcement may result in some inconvenience to the voter, the restrictions placed upon the manner of voting, and the regulations under which votes may be received and placed in the ballot-boxes, are within the province of the Legislature, under sections 2 and 6, article 7, of the Constitution, which provide that "all votes shall be given by ballot, except for such township officers as may be authorized by law to be otherwise chosen," and that "laws may be passed to preserve the purity of elections, and guard against abuses of the elective franchise."

b—It is unlawful for any inspector of election to assist in marking a ballot for any elector who claims to be unable to read English, until such elector shall have first made oath to the fact, as provided by section 32 of the act: and, the requirement being mandatory, votes in violation thereof should not be counted.

c—Whatever may be said in reference to the power and authority of the United States supervisors of election under the federal law to mark ballots, or see them marked, for the purpose of seeing that the election of a member of Congress is fairly and properly conducted, it is apparent that deputy United States marshals have no such right or authority; citing *United States v. Gitma*, 3 Hughes, 549.

Information in the nature of *quo warranto* to determine the title to the office of clerk of Wayne county. Issues of fact were sent to the Oakland circuit for trial, upon which the jury found in favor of relator, who now moves for judgment of ouster. Argued February 27, 1894. Judgment of ouster entered March 30, 1894. The facts are stated in the opinions, and in 94 Mich. 505, 97 Id. 568.

*A. A. Ellis,* Attorney General (*Jasper C. Gates* and *John B. Corliss,* of counsel), for relator.

*Edwin F. Conely* and *Orla B. Taylor* (*F. A. Baker,* of counsel), for respondent.

LONG, J.    This is an information in the nature of a *quo warranto* to determine the question whether the relator or the respondent received the greater number of legal votes cast in the county of Wayne at the general election held November 8, 1892, for the office of county clerk.

The original election returns, as certified by the inspectors of election and returned to the office of the county clerk, show that the relator received 26,821 votes, and the respondent 26,799, or a majority for the relator of 22 votes.    A recount was had under Act No. 208, Laws of 1887 (3 How. Stat. § 234*a*), by which it was shown that the respondent received 26,847 votes, and the relator 26,-729, or a majority for the respondent of 118 votes; and the board of county canvassers was directed to issue the certificate to the respondent.    *May v. Board of Canvassers,* 94 Mich. 505.

In the present proceeding eight replications were filed to respondent's plea.    Respondent demurred to these replications.    The cause was heard on these demurrers at the October term, 1893, and the demurrers overruled, with leave to the respondent to plead over.    The decision of these questions is reported in *Attorney General v. May,* 97 Mich. 568.    Rejoinders were filed by respondent to these replications, denying the facts therein set forth, and putting himself upon the country.    The cause was subsequently sent down to the Oakland circuit court for trial of these issues of fact.    Forty-nine special questions were submitted to the jury for their findings, and, by their answer to question No. 46, they have found that Henry M. Reynolds received the greatest number of votes cast for the office of

county clerk, and that he had a majority over May of 1,926 votes. The trial court has returned the proceedings into this Court, and relator now asks judgment of ouster against respondent.

The cause has been very ably argued upon both sides, and the issues now to be determined are narrowed down to two or three points. The principal question is raised under the sixth replication, the substance of which is set out in *Attorney General v. May*, 97 Mich. 572. In that it is alleged that in the fourth precinct of the Fifth ward of the city of Detroit the chairman of the board of inspectors of election illegally and wrongfully received 750 ballots, and illegally and wrongfully deposited the same in the ballot-box, said ballots having been marked and shown to persons who were not lawfully assisting the voters, or any of them, in the preparation of their ballots, before said ballots had been deposited, and that the same were shown in such a manner as to disclose to the persons to whom they were shown some or all of the names of the candidates voted for upon said ballots; that said ballots were so deposited, unmarked and unchallenged by the board of inspectors; that said votes went to make up the large majority of 553 votes in favor of respondent; that, by reason thereof, the election in said precinct was rendered wholly invalid, illegal, and of no effect upon the election for the office of county clerk; and that, by reason thereof, the said relator was elected by a majority of 565 votes. The objection to this replication was that it tendered an immaterial issue, and that it was not averred that the election in said district was so invalid as to effect the disfranchisement of all the electors therein. It was said by this Court in the opinion overruling the demurrer:

"It is alleged that 750 ballots were exhibited contrary to law; that the election in that precinct was therefore void; and that, with those votes thrown out, the relator

was elected. The allegation is not confined to the canvass and recount, but to the illegality of the vote. If respondent's position be true that the replication alleges simply that the canvass and the recount of the votes cast at this precinct were invalid and illegal, the fair import of the language is that it attacks the legality of the entire vote for the entire precinct."

Issue was joined upon this replication by the respondent, and it became one of the questions of fact to be found by the jury. By the answers to questions 13 and 14, the jury found that Henry M. Reynolds received in all the townships and voting districts of said county, not including the fourth district of the Fifth ward of Detroit, 25,910 votes, and that William May received in such townships and wards, not including the fourth district of the Fifth ward, 23,984. To question No. 46, the jury found that Mr. Reynolds received 1,926 majority over Mr. May. Many questions are raised over the findings under certain other of the replications, but, as the determination of the question arising under the sixth replication must settle the controversy in favor of Mr. Reynolds, the relator, we need not enter fully upon a discussion of the other questions. All of the votes in the fourth district of the Fifth ward of Detroit were discarded by the jury.

The testimony on the part of the relator showed that the inspectors of election in that district were Alois Deimel, Edward Fierz, John Manquen, Bernard Zentarski, Peter Brinker, and John Vandergyp; that no one was designated by the board to assist voters in the preparation of their ballots; that William F. Schneider and John Erhard were United States supervisors of election, and that Joseph Deimel and Peter Knauss were deputy United States marshals, for that district; that the greater part of the voters were Poles, Germans, and Italians, and that from 600 to 700 of these voters were assisted in marking their ballots because they could not read English; that none of

the voters thus assisted was sworn as to his inability to read English; that the only persons who actually marked the ballots for such voters were Alois Deimel, John Vandergyp, Joseph Deimel, and Peter Knauss; that during the election the marking of ballots for voters in this district as above described was seen and observed by the United States officers of election and the deputy. United States marshals above named. On the part of the respondent, it is shown by the testimony, and admitted, that this large number of voters were assisted in marking their ballots, and, as claimed, because they could not read English; and that none of them, thus assisted, had been sworn as to his inability to read English. It is not denied that these deputy United States marshals saw how these ballots were marked, but it is claimed that this method was adopted because it was believed that, on account of the large registration and the great number of voters needing assistance, the proper vote of the district could not be cast if the work of assisting voters were to be done only by Deimel and Vandergyp in company with each other. It was also shown that Deimel and Vandergyp were designated by the board to assist voters in marking their ballots.

1. It is contended by counsel for respondent that the court was in error in its direction to the jury that—

"If any voter was not first sworn as to his inability to read English, and he allowed his ballot to be marked for him, or allowed any one to see his ballot when it was marked, he thereby lost his right to vote at that election; and it was unlawful for any inspector of election to mark the ballot of any elector who had not been sworn as to his ability to read English."

Upon this point it is contended that the statute under which this portion of the charge was given is not mandatory, but directory merely, and that the provision requiring assisted voters to be first sworn, as construed by the court

below, is unconstitutional, because it puts unreasonable restrictions upon the right to vote.

Section 32, Act No. 190, Laws of 1891, provides:

" When any elector shall make oath that he cannot read English, or that because of physical disability he cannot mark his ballot, or when such disability shall be made manifest to said inspectors, his ballot shall be marked for him, in the presence of at least two of the inspectors, by an inspector designated by the board for that purpose, who is not a candidate on said ticket."

By section 26 it is provided:

"If any elector shall show his ballot, or any part thereof, to any person (other than one lawfully assisting him in the preparation thereof), after the same shall have been marked, so as to disclose any of the candidates voted for, such ballot shall not be received or deposited in the ballot-box. In case such elector shall so expose his ballot, his name shall be entered on the poll lists with a minute of such occurrence, and such elector shall not be allowed to vote thereafter at said election."

Section 45 of the act provides:

" Any person who shall    *    *    *    disclose to any other person the name of any candidate voted for by any elector, the contents of whose ballot shall have been seen by such person,    *    *    *    shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding $1,000, or imprisonment in the State prison not exceeding two years, or by both such fine and imprisonment, in the discretion of the court."

These provisions were intended to secure the entire secrecy of the ballot, except so far as was absolutely necessary to enable such electors as could not read English to have assistance in marking it. The only test under this statute which the inspector, who is designated to assist the voter, can apply to determine whether the elector can read English, is that the elector shall make oath of the fact. No other test is permissible, and it is unlawful for any inspector to assist in marking a ballot for any

elector who claims that he cannot read English until such elector shall have first made oath to the fact. The construction contended for by the respondent cannot be given. Such interpretation would allow a voter to be assisted upon his own mere statement that he could not read English, and give inspectors unlimited discretion to mark ballots. The intention of the Legislature was to limit the marking to those who made the oath, or to those who from physical disability could not mark them. This intent is evidenced by the other portions of the statute above quoted, as, by section 26, if the ballot is seen after it is marked by any other than the inspector lawfully assisting, so as to disclose any of the candidates voted for, such ballot shall not be received or deposited in the box; and, under section 45, a penalty by fine and imprisonment is imposed upon any one disclosing the contents of a ballot seen by him. These provisions are mandatory, and the court very properly so charged the jury. These very sections were under consideration in *Attorney General v. McQuade,* 94 Mich. 439, and were there held mandatory. Similar provisions were also held mandatory in the following cases: *People v. Board of Canvassers,* 129 N. Y. 395; *People v. Board of Supervisors,* 135 Id. 522; *Phelan v. Walsh,* 62 Conn. 260; *Baxter v. Ellis,* 111 N. C. 124; *Spurgin v. Thompson,* 37 Neb. 39; *Bechtel v. Albin,* 134 Ind. 193; *In re Ballot Marks* (R. I.), 27 Atl. Rep. 608.

Under the proposition that the act is unconstitutional because it puts unreasonable restrictions and regulations upon the right to vote, counsel cite *Attorney General v. Common Council of Detroit,* 78 Mich. 545. That case arose under a local act of the city of Detroit, passed in 1889, and it was held invalid because its tendency was to disfranchise a large class of voters in the city by unreasonable restrictions upon the manner of registration and of

finding that they were entitled to registration. Such claim cannot be made under this act. The regulations are to preserve the purity of the elections, and we see no constitutional objections to them as prescribed by the act. Certainly the reasons given by this Court for holding the act void in *Attorney General v. Common Council of Detroit* have no application here.

Similar laws have been upheld in many other states. In *Ransom v. Black*, 54 N. J. Law, 446, 451, the supreme court of New Jersey, speaking of similar provisions of a statute in that state, say:

"Any provision in such an act which is likely to bring about a result which conduces to the purity of popular elections should receive a favorable consideration. It is, of course, true that, if the effect of any provision is to shut off a voter from the ballot-box, such provision must fall before the constitutional guaranty of the right to vote. But in measuring cases of mere inconvenience, expense, or sentiment, the existence of a salutary purpose, and the likelihood of the provision tending to accomplish that purpose, must weigh greatly in determining the reasonableness of the statutory regulation."

The supreme court of Missouri, in *Bowers v. Smith*, 111 Mo. 45, 57, say:

"This 'ballot reform law' was intended to improve the methods for giving expression to the popular will in the choice of public officers. It should be construed so as to promote, not destroy, the great objects in view in its passage."

And the supreme court of Pennsylvania, in *De Walt v. Bartley*, 146 Penn. St. 529, say:

"The law itself may be regarded in the light of an attempt on the part of the people to secure a pure, free, and unintimidated ballot. Every presumption is in favor of the constitutionality of the law."

The following cases also uphold the constitutionality of

similar acts: *In re Ballot Marks* (R. I.), 27 Atl. Rep. 608; *Miner v. Olin,* 159 Mass. 487; *Simpson v. Osborn,* 52 Kan. 328; *State v. Benton* (Mont.), 34 Pac. Rep. 301; *Atkeson v. Lay,* 115 Mo. 538.

Our Constitution, by article 7, § 2, provides: "All votes shall be given by ballot, except for such township officers as may be authorized by law to be otherwise chosen;" and by section 6 of the same article it is provided: "Laws may be passed to preserve the purity of elections, and guard against abuses of the elective franchise." The act in question was passed to secure this end; and although it may result in some inconvenience to the voter, the restrictions placed upon the manner of voting, and the regulations under which votes may be received and placed in the ballot-boxes, are within the province of the Legislature under the provisions of the Constitution above quoted. The law aims to secure secrecy in the ballot, and does not attempt to disfranchise any voter. At the expense of this secrecy, and in order to enable electors to vote who are physically incapacitated from marking their ballots, the law provides a method for such aid, as well as to those who cannot read the English language. The law does not deprive these voters of any right, but rather secures to them aid in voting intelligently. It is plain and simple in its provisions. Every voter, however illiterate or however much incapacitated physically, has a method pointed out by which he may exercise his right of franchise. The law does not shut off any class of voters from the ballot, and, we think, was designed by the Legislature to accomplish the purpose specified in the Constitution. Act No. 263, Laws of 1889, containing provisions to secure purity of elections, was before this Court, and held valid in *Common Council of Detroit v. Rush,* 82 Mich. 532, and the present act was before this Court in *Shields v. Jacob,* 88 Mich. 164; *Chateau v. Jacob,* 88 Id.

170; and *McQuade v. Furgason,* 91 Id. 438. The questions in these cases referred to other provisions of the act, but in each the provisions of the act were enforced in the furtherance of the purity of the elections.

2. It is contended that the court was in error in directing the jury:

"It is unlawful for either United States marshals, challengers, or others, except inspectors of election who are lawfully assisting him, to either mark the ballots for voters, or to see them as marked, and before they are deposited in the ballot-box. All of such ballots are void; and it is contrary to law either to deposit them in the ballot-box, or to count or consider them in determining the result of the election."

Section 32 provides the only authority by which an elector may have a ballot marked. It has been quoted above. The marking can be done only by an inspector designated by the board for that purpose, and in the presence of at least two of the inspectors. Under this act, no other can lawfully mark ballots, and to no other can the ballot be exhibited, unless United States supervisors of election may see them when a member of Congress is to be elected. The court was therefore right in its interpretation of this act, if United States supervisors of election may not witness the marking. But counsel for respondent contend that, inasmuch as members of Congress were to be elected at that election, this act must be construed in the light of, and in subordination to, sections 2017, 2019, 2021, 2022 of the Revised Statutes of the United States. Section 2017 provides that—

"Supervisors of election are authorized and required to attend at all times and places for holding elections of representatives or delegates in Congress; * * * to be and remain where the ballot-boxes are kept at all times after the polls are open until every vote cast at such time and place has been counted; * * * and to personally inspect and scrutinize, from time to time, and at all times,

on the day of election, the manner in which the voting is done."

Section 2019 provides that—

" The better to enable the supervisors of election to discharge their duties, they are authorized and directed * * * to take, occupy, and remain in such position, from time to time, whether before or behind the ballot-boxes, as will, in their judgment, best enable them to see each person offering himself for registration or offering to vote; and as will best conduce to their scrutinizing the manner in which the registration or voting is being conducted."

By section 2021 it is provided that deputy United States marshals shall attend, at all times for holding elections, the polls in such district or precinct; and, by section 2022, it is further provided that—

" The marshal and his general deputies, and such special deputies, shall keep the peace, and support and protect the supervisors of election in the discharge of their duties, preserve order at such places of registration and at such polls, prevent fraudulent registration and fraudulent voting thereat, or fraudulent conduct on the part of any officer of election."

Counsel for respondent, it appears, at the close of the testimony, asked the court to instruct the jury, in their fifth and ninth requests, as follows:

" 5. If you are satisfied from the evidence that the method pursued by Inspectors Deimel and Vandergyp, in company with United States Officers Erhard and Knauss, in assisting voters in preparing their ballots, was pursued in good faith, and the voters in like manner received such assistance, then, in respect of the preparation of them, the ballots must be treated as valid."

" 9. Under the Constitution and laws of the United States, the United States supervisors and deputy marshals at the election in question were authorized to put themselves in such place or places as would enable them to see that the ballot of an assisted voter was marked as directed or desired by the voter, and a disclosure of the contents of

such ballot to the United States officers under such circumstances does not invalidate it."

These requests were refused. Mr. Erhard, referred to in the fifth request, was United States supervisor of election, and Mr. Knauss a deputy United States marshal. By the finding of the jury, it appears that Mr. Erhard did not mark any of the ballots himself, but he saw others mark ballots of voters, and there were disclosed to him the names of candidates voted for on 20 of the ballots so marked; and that the other supervisor of election saw 100 marked, and these were disclosed to him. But we shall not, for the purposes of this case, regard these ballots as irregular. It appears that Mr. Knauss, the deputy United States marshal, marked the ballots of 10 electors, and had disclosed to him the ballots of 100 electors after they were marked, so that he saw the names of the candidates voted thereon. Under the charge of the court, the jury were directed that it was unlawful for these officers to mark ballots or to see them marked, or for any disclosure of such ballots to be made to them. It is therefore seen that the court below did not discriminate between the United States supervisors of election and the deputy United States marshals.

Whatever may be said in reference to the power and authority of the United States supervisors of election under the federal law to mark ballots, or see them marked, for the purpose of seeing that the election is fairly and properly conducted, it is apparent that the deputy United States marshals have no such right or authority. In *U. S. v. Gitma*, 3 Hughes, 549, after citing sections 2017 and 2019 of the Revised Statutes of the United States, above quoted, the court said:

"Thus, not only does the law in terms empower a supervisor to be in the room with the judges of election, but empowers him to be in any place or position in which, in

his own judgment, he can best perform his duties. The act of Congress which is thus specific in defining and complete in conferring these powers on supervisors is the same one which prescribes the duties of deputy marshals. While it is thus express and full in regard to supervisors, it is the reverse in defining the authority of deputy marshals. Section 2021 simply provides that, 'when required' to do so by the supervisors, it shall be the duty of deputy marshals to 'attend the polls' in their districts or precincts. The section gives the deputy marshals no authority except to be present at the polls. The same act of Congress which expressly 'directs' supervisors to place themselves before or behind the ballot-boxes as they may think proper is silent in regard to deputy marshals, and gives them no such authority."

It is said by the court, in reference to section 2022, that that section defines the object of the appointment of deputy marshals, and defines their powers and duties,— that is, to keep the peace, and support and protect the supervisors in the discharge of their duties,—and omits to give them authority to go behind the ballot-boxes and place themselves in any position they please, and that their duties are therefore not those of supervisors of election, but those of conservators of the peace at the polls, and that they have no right to be in the room in which the judges and supervisors of election are performing their duties, or go behind the ballot-boxes, unless requested to do so by the judges and supervisors, except to suppress violence, or to preserve the peace when actually disturbed, or to prevent fraud actually attempted in the room.

It is evident from the reading of these statutes that the deputy United States marshals, in the present case, had no right to mark ballots or to see them marked, or to know for whom the electors were voting. The court was therefore right in its direction to the jury, so far as the deputy United States marshals are concerned, and therefore right in refusing the requests to charge, as the requests coupled the marshals with the supervisors of

election.    Whether the court was correct in the charge as
to United States supervisors of election we need not dis-
cuss or pass upon, as it is apparent that, if the court was
wrong in that particular, the respondent is not in any
manner prejudiced by the ruling, as will be made apparent
in our further discussion.

The jury found, by the 13th and 14th findings, that
the relator received in all the voting precincts of the
county, aside from the fourth district of the Fifth ward
of Detroit, 25,910 votes, and that the respondent received
in the same districts 23,984 votes.    The jury also found,
by the 46th finding, that the relator had a majority over
the respondent in all the districts within the county of
1,926 votes.    It is thus apparent that the jury, in arriv-
ing at this result, threw out the entire fourth district of
the Fifth ward.    This was undoubtedly done under the
testimony and the charge of the court, in which they were
directed as follows:

"If illegal votes were received, and the evidence does
not show in whose favor the illegal votes were cast, and
they are as great in number as the majority received in
that voting district, then the election in the district shall
be thrown out and disregarded by you.    If the evidence
does not disclose for whom such illegal votes were cast,
and they are less in number than the majority in that
voting district, then they should be taken from the total
vote proportionately, according to the entire vote returned
for each candidate in that precinct."

It is contended that this was error.

As to the fourth district of the Fifth ward, the jury found
that Alois Deimel and John Vandergyp were designated as
inspectors, by the board of inspectors, to mark ballots for
electors who made oath that they could not read English.
They found that 565 electors were assisted in marking
their ballots because they could not read English, and that
not one of them made oath that he could not read Eng-

lish. The jury further found that in that district Alois Deimel marked 320 ballots, and John Vandergyp 10 ballots, not in the presence of any other inspector; that Joseph Deimel, deputy United States marshal, marked 10 ballots, and saw 100 ballots marked by others, and that the contents thereof were disclosed to him; that Peter Knauss, deputy United States marshal, marked 10 ballots, and saw 100 ballots marked by others, and that the contents thereof were disclosed to him; so that the jury found at least 550 illegal ballots cast at that poll, not counting those seen by the supervisors of election. In the fourth district of the Fifth ward, the record shows that the relator received 298 votes and the respondent 858 votes, or a majority for respondent of 560. It appears, therefore, that, upon this theory, the jury must have taken into account the ballots seen marked by the United States supervisors of election to make the number of illegal votes equal to the majority received by the respondent; that is, the 20 disclosed to Erhard and the 100 seen by the other supervisor, Mr. Schneider.

If, however, the whole district should not have been excluded, and the illegal vote had been taken from the total vote proportionately, according to the entire vote returned for each candidate in that district, it is apparent that the relator would still have a majority of the whole vote of the county, as shown by the finding of the jury, that being that the relator had 1,926 majority. If it be conceded that the respondent should have had the vote of that district apportioned, then he should be credited with a majority over the relator of 294. If now we take the other districts where the respondent had a majority less than the illegal vote, and make the same deductions, to wit, the fourth district of the Ninth ward, fifth district of the Eleventh ward, and fourth district of the Twelfth ward, he should be credited with 206 votes more; that is,

in the fourth district of the Fifth ward, together with these other districts which should have been apportioned, he should be credited with a majority of 500 votes. But even this leaves the relator ahead 1,426 votes in the whole county. So that, if it be conceded that the court was in error in the charge in permitting the jury to throw out any district, and all the districts in which the respondent had a majority be apportioned under the rule laid down by the court, still the relator has a majority. This majority would be increased if the same rule were to be applied to districts where relator's majority was less than or equal to the illegal vote, as the jury found it was in the ninth district of the Second ward, the first district of the Fourth ward, the first district of the Sixth ward, the third district of the Eleventh ward, and the second district of the Thirteenth ward.

But it is claimed that the court erred in admitting testimony tending to show how many of the illegal voters voted, and in requiring inspectors of election and United States supervisors and deputy marshals to testify to the contents of ballots which were made known to them only in the performance of their official duties. This testimony is found in the cross-examination of respondent's witnesses, and that given by relator in rebuttal. The former relates to 15 different districts, and the latter to 11 districts. We have carefully examined that testimony, with the result that ballots for both candidates were shown to have been exhibited so that parties seeing the ballots were able to state for whom the elector was voting, the only difference being that about 30 more ballots were exhibited showing respondent's name thereon than the relator's, so that, if all such ballots were excluded, it could make no possible difference in the result.

If, therefore, the court was in error in directing the jury that "if illegal votes were received, and the evidence does

not show in whose favor the illegal votes were cast, and they are as great in number as the majority received in that voting district, then the election in the district shall be thrown out and disregarded by you," it could not affect the result. We need not, therefore, pass upon the question whether the court was or was not correct in his instruction. It went beyond the rule laid down in *Attorney General v. McQuade*, 94 Mich. 439. In that case the question was one of fraud affecting the whole poll, and the rule was adopted from the language of the court in *Heyfron v. Mahoney*, 9 Mont. 497, and other cases there cited, that, where the frauds are of such character that the correct vote cannot be determined, the return of the precinct will be rejected. In the present case the inspectors and other officers of the various districts are not charged with active fraud, but with marking ballots of those who claimed they could not read English without their having first made oath as to that fact. This may have arisen from the interpretation of the statute now claimed by respondent's counsel; that is, that such provisions are not mandatory, but directory merely. And, again, it appears that proofs were obtainable and actually introduced as to the number of electors whose ballots were so marked. This would not, under the facts shown, necessarily taint the vote of the whole district, and it would not taint the whole ballot if the jury were able to determine the correct ballot, as, under such circumstances, it would not destroy the presumption of the correctness of the other ballots cast. But, as said, this question, as it relates to the present case, is of but little moment, for the jury were able to determine the number of illegal votes put into the boxes in the various districts.

3. We now come to the other portion of the charge, where, in substance, the jury were directed that they should take the illegal votes from the total vote proportionately, according to the entire vote returned for each

candidate in that district. In this we think the court, under well-settled rules, was entirely correct. It is a fair way to arrive at results. The rule is based upon the proposition that the illegal votes have gone into the boxes without the fault of either candidate. If these illegal votes can be separated from the legal ones, so that the number is substantially ascertained, then the poll is too large by exactly that number, and they must be cast out. In casting them out, the rule laid down by the court below is sustained by McCrary, Elect. (3d ed.) § 460, where it is said:

" Of course, in the application of this rule such illegal votes would be deducted proportionately from both candidates, according to the entire vote returned for each."

In 6 Amer. & Eng. Enc. Law, p. 353, it is said:

" Where more ballots are found in the ballot-box than there are names on the poll list, the statutes of many of the states require the officers of election to draw out enough ballots, without seeing them, to make the number equal to that of the voters. And, where they have not done this, it is probable that no other mode would be preferable to that of deducting from each candidate a number of votes proportioned to his total vote compared with the aggregate vote of the precinct;" and the following cases are cited: *Gibbons v. Sheppard*, 2 Brewst. 128; *Finley v. Walls*, 4 Cong. Elect. Cas. 367; *Platt v. Goode*, Id. 650.

Our statute (section 174, How. Stat.) provides:

" If the ballots in the box shall be found to exceed in number the whole number of names of electors on the poll lists, they shall be replaced in the box, and one of the inspectors shall publicly draw out and destroy so many ballots therefrom, unopened, as shall be equal to such excess."

Mr. Justice COOLEY, in speaking of this provision of the statute in *People v. Cicott*, 16 Mich. 323, says:

" As each ballot is usually one of a number designed to

be allowed to particular candidates, and counted against others given to other candidates, the drawing may still work no injustice, since each candidate will probably lose by it a number proportioned to the relative number of ballots appearing for him. in the box, and thus the relative proportions will be preserved."

This rule, he says, "is based upon the doctrine of probabilities." While we have no statute directing the mode of apportionment laid down by the court below, yet the rule, we think, is one which does no injustice to either candidate, and in the end carries into effect, as nearly as may be, the will of the people as expressed at the polls.

4. But one further question need be discussed. It is contended by the respondent that the court erred in ruling that the relator had the opening and closing in putting in the proofs and in the argument to the jury. We think there was no error in this. The burden of proof was upon the relator to establish his title to the office. In the proceeding, the relator prosecutes and the respondent defends. We think the rule is that the right to open and close belongs to the party who seeks to alter the existing state of things, as stated by Thomp. Trials, § 237.

Judgment must be entered finding the relator entitled to the office, and of ouster against the respondent.

GRANT, MONTGOMERY, and HOOKER, JJ., concurred with LONG, J.

MONTGOMERY, J. (concurring). I cannot assent to any construction of the statute which shall result in nullifying the salutary provisions which were intended as safeguards against the interference with voters in the exercise of their franchise, and were likewise intended to preclude the possibility of improper influences being brought to bear upon the voter; and it seems to me that the statute is so plain that one carefully considering the provisions with a purpose of getting at the legislative intent need not err therein.

Section 21 of the act provides for the erection in all voting precincts of a railing or fence, four feet in height, which is to be placed through and across the room, and for the construction of gates; and provides for a sworn gatekeeper, who shall be "sworn to allow no person to pass through said gate and enter said railing except as otherwise provided in this act, except to vote or to assist some elector in the preparation of his ballot, as provided in this act;" and provides that "no person shall be allowed to be inside of said railing, except to vote, or to assist an elector in the preparation of his ballot, *as hereinafter provided.*" Act No. 190, Laws of 1891. The only provision made in the act for assisting a voter is section 32, which provides that—

"When any elector shall make oath that he cannot read English, or that because of physical disability he cannot mark his ballot, or when such disability shall be made manifest to said inspectors, his ballot shall be marked for him, in the presence of at least two of the inspectors, by an inspector designated by the board for that purpose."

The provision of the law is plainly that no inspector can be in a position to observe the marking of the ballot except in case of physical disability, unless the elector shall make oath that he is unable to read the English language. No constitutional right is infringed by this provision in the interests of the purity of elections. Its purpose is plain, —to prevent the bartering and sale of votes, either through the instrumentality of inspectors of election or of others outside the booths,—and it is only in the exceptional case of a voter who cannot read the English language, and who makes the fact manifest by his oath, that there can be any departure from the usual method. If the requirement is held not mandatory, the inspector can be present in all cases as well as in a single case. But section 26 has made the legislative intent certain. This provides that—

" If any elector shall show his ballot, or any part thereof, to any person (other than one lawfully assisting him in the preparation thereof), after the same shall have been marked, so as to disclose any of the candidates voted for, such ballot shall not be received or deposited in the ballot-box."

I am aware that many cases may be cited in which provisions relating to the method of conducting elections are held directory. But, certainly, the better authorities and the better reasoning do not justify the *counting* of a ballot which by the terms of the act it is provided shall not be *received*. I am not able to distinguish how a provision that a vote shall not be counted would more clearly indicate the legislative intent than does one which provides that it shall not be received or deposited in the ballot-box, from which place alone it can be counted.

I concur with Mr. Justice Long.

Long, Grant, and Hooker, JJ., concurred with Montgomery, J.

McGrath, C. J. *(dissenting)*. I am unable to agree with my brethren in the conclusions reached by them. The original returns, as certified by the inspectors of election, gave May 26,799 votes and Reynolds 26,821, leaving a majority for Reynolds of 22 votes. The recount, made under Act No. 208, Laws of 1887, by a Republican board of canvassers, gave May 26,847 votes and Reynolds 26,729, or a majority for respondent of 118. In his replications to respondent's plea, Reynolds sets forth:

1. That 74 ballots cast for respondent bore distinguishing marks, and were therefore illegal and void.

2. That in the township of Ecorse, and in the First and Third wards of the city of Wyandotte, after the votes had been canvassed and returned, and before the recount was made, the votes cast were changed, erased, altered, and mutilated in the interest of respondent, so as to destroy 106 votes, which were cast in favor of relator,

and insert in said ballot-boxes, instead thereof, 100 false and fraudulent votes.

3. That there was no valid and legal election held or had in the fourth precinct of the Fifth ward, for the reason that 215 ballots were cast by persons who were not registered as electors.

4. That there was no valid election in said last-named precinct, for the reason that five outsiders wrongfully, illegally, and with the approval of the chairman of the board of election inspectors went into the polling booths, and worked, and influenced 750 voters, and marked their ballots, and said ballots were illegally received.

5. That in such last-named precinct 750 voters exposed their ballots to persons who were not lawfully assisting them.

6. That 215 unregistered voters were not sworn as required by law to justify their registration on election day.

7. That in the following named precincts the number of votes enumerated were cast by persons whose names were not entered on the poll lists; that the number of ballots found in the boxes at the close of the poll were in excess of the names on the poll lists; that all of said ballots so cast were canvassed, and that the poll lists were not placed in the ballot-boxes, but were concealed or destroyed, to wit: In the second precinct of the Sixth ward, 528 votes; in the third precinct of the Sixth ward, 495 votes; and in the second precinct of the Seventh ward, 601 votes.

No further or other charges were contained in the pleadings. Questions were framed, submitted, and sent to the jury, and have been answered. The first nine questions, and the answers thereto, are as follows:

"1. Did any of the ballots containing votes cast in favor of said respondent, William May, when the same were voted, bear distinguishing marks; that is to say, letters, initials, words, or marks so made thereon as to distinguish each of the same, respectively, from the other ballots cast at that election?

"*A*. No.

"2. If so, how many, as near as can be estimated?

"*A*. Not any.

"3. How many votes were cast in favor of said relator, Henry M. Reynolds, in the township of Ecorse?

"*A*. 243.

"4. How many votes were cast in favor of said respondent, William May, in said township of Ecorse?.

"A. 450.

"5. How many votes were cast in favor of said relator, Henry M. Reynolds, in the First ward of the city of Wyandotte?

"A. 188.

"6. How many votes were cast in favor of said respondent, William May, in the First ward of the city of Wyandotte?

"A. 132.

"7. How many votes were cast in favor of said relator, Henry M. Reynolds, in the Third ward of the city of Wyandotte?

"A. 206.

"8. How many votes were cast in favor of said respondent in the Third ward of the city of Wyandotte?

"A. 132.

"9. After the votes cast for said parties in said township of Ecorse, and in said First and Third wards of said city of Wyandotte, had been canvassed and returned by the board of inspectors of elections thereof, were any of the votes cast therein changed, erased, altered, or mutilated at any time before the meeting of the board of county canvassers?

"A. No."

(The figures given in answer to the third, fourth, fifth, sixth, seventh, and eighth questions are the exact figures returned by the canvassing board upon the recount.)

By these answers it will be observed that the charges made in relator's first and second specifications are expressly denied. The charges made in the sixth and seventh specifications were abandoned on the trial. Out of the 215 persons referred to in the third specification, relator's own witness, Lemkie, found the names of all but 14 on the registration list, and, of those found by him, 14 were discovered on the witness stand upon cross-examination. The jury found, not that the inspectors did not find these 14 names, but that they actually found all the other names. This would not affect the result, and dis-

99 MICH.— 36.

poses of the third specification.  There is no pretense that any person went into any booth and worked or influenced a single voter, as charged in the fourth specification. The only other charges made are:

1. That a large number of voters exposed their ballots, and the ballots so exposed were received.

2. That voters were assisted without first having been sworn as to their inability to read English, as required by law.

Although the law provides that no election district shall contain more than 500 electors, 1,156 electors actually voted in the fourth precinct of the Fifth ward.  There were 300 more votes cast in this district than in any other district in the city.  About 42,250 votes were cast in the entire city, which is divided into 102 voting precincts. Thirty-five precincts cast 22,400 votes, or an average of 640 each, while 67 districts cast 19,850 votes, or an average of 296 each.  The First ward, where, out of a total vote of 3,299, relator received a majority of 541, is divided into eight districts.  The Second ward, where, out of a total vote of 2,914, relator received a majority of 476, is divided into nine precincts.  The Fourth ward, where, out of a total vote of 3,060, relator received a majority of 498, is divided into eight precincts.  The Fifth ward, where respondent, out of a total vote of 3,165, received a majority of 635, is divided into five districts. Relator attacked five other precincts, in each of which there are large numbers of German and Polish voters, and the number of votes cast in each average 700.  In these districts the charge was made, and the only charge made in any district except the fourth precinct of the Fifth ward was, that large numbers of voters were assisted without first having taken the oath.  Relator's proofs tended to show that there were 700 assisted voters in the fourth

precinct of the Fifth ward, 550 in another precinct, 526 in another, 425 in another, and 345 in another.  The law provides that the voter shall be assisted by " an inspector," in the presence of another inspector, and that the polls shall continue open 10 hours, or 600 minutes.

At the trial, relator introduced the following testimony in support of the allegations relative to the fourth precinct of the Fifth ward:

" That in the fourth district of the Fifth ward the registration list, made prior to and used at the election, appeared as is set forth in the original registration book, which was introduced in evidence, and .which, it is agreed by counsel, may be produced by either party at the hearing on this report in the Supreme Court, instead of having a copy annexed hereto; that the poll lists made at the election were two in number, and as set forth in the originals, which were introduced in evidence, and which, it is agreed by counsel, may be produced by either party at the hearing on this report, instead of having copies annexed hereto; that the poll lists were written respectively by Casper Hoffman, a German, and Henry Vincent, an American of French descent; that the board of inspectors of election and board of registration in this district consisted of the following named persons: Alois Deimel, Edward Fierz, John Manquen, Bernard Zentarski, Peter Brinker, and John Vandergyp; that this board consisted of four Democrats and two Republicans; that no one was designated by the board to assist voters in the preparation of their ballots; that John Erhard, a Democrat, and William F. Schneider, a Republican, were the United States supervisors of election; that Joseph Deimel, a Democrat, and Peter Knauss, a Republican, were deputy United States marshals; that there was one Democrat challenger and one Republican challenger; that two metropolitan policemen were stationed at the door through which voters were admitted from the street, and were in position to observe all that was going on in the room containing the booths; that the greater part of the voters consisted of Poles, Germans, and Italians; that from 600 to 700 of the last-mentioned voters were assisted in the marking of their ballots, because they could not read English; that none of the voters thus assisted was sworn as to his inability to

read English; that the only persons who actually marked the ballots for such voters were Alois Deimel, John Vandergyp, Joseph Deimel, and Peter Knauss; that during the election the marking of ballots for voters in this district, as above described, was seen or observed by the United States officers of election and deputy United States marshals above named; that the names set forth in question number 16 were selected by a witness for the relator, one Felix A Lemkie, a German of Polish extraction; that in selecting these names he had before him poll lists, Exhibit 99, and a printed copy of the registration list; that he had examined for the first time original poll list, Exhibit 98, on the Saturday and Sunday before giving his testimony in the case, together with the original registration book; that he had made a careful examination; that he was unable to find, and there was not, in the registration book, the following names: No. 58, Q. Gabriels; No. 170, A. Katino; No. 188, Wm. Greataw; No. 224, Louis Tremonte; No. 227, Gus Debold; No. 254, Leo. Brichato; No. 290, A. Labasch; No. 310, Geo. Peterson; No. 352, Fred. Ziesse; No. 395, Chas. Stuerwald; No. 433, Frank Schœner; No. 709, Wenzil Ziska; No. 721, John Klaus; No. 726, Fred. Scheffler; No. 774, Jacob C. Land; No. 786, Jacob Weiley; No. 874, John Garbarino; No. 962, John Gremps; No. 1044, Phillip Green; No. 1068, Louis Gencorde; No. 1099, John A. Peters; No. 1103, C. J. Dean; No. 1115, Stephen Sauer; No. 1153, John Oss; No. 1155, Samuel Einick; No. 1161, John Ciescke; No. 1165, Aton Gora; No. 1186, Joseph Slanz (at this point relator's counsel announced that they would confine themselves to the 28 names above given); that, on cross-examination Lemkie was able to find 14 of the 28 names above given; that during the entire day a Republican challenger was in attendance with a book containing a list of registered persons whose votes might be questioned, which book was furnished him by a Mr. Burt, chairman of the Republican city and county committees; that the Republican United States supervisor, from the opening of the polls until about 2 o'clock P. M., was present, and also looked after the manner of voting; that all persons objected to by them and others were not allowed to vote until the matter was investigated, and their right to vote established. There was no testimony introduced tending to show that unregistered voters had

voted in the fourth district of the Fifth ward, except the registration book and the poll lists above mentioned."

The testimony for the respondent as to the fourth precinct of the Fifth ward was as follows:

"Testimony tending to show that in the fourth district of the Fifth ward the board of registration and board of inspectors of election for this election were as above set forth; that, by resolution of the board of inspectors, Alois Deimel, Democrat, and John Vandergyp, Republican, were appointed or designated to assist voters who might need such assistance in marking their ballots; that Dr. Kwie-cinski, a Pole, acted as interpreter; that Inspector Zent-arski examined the registration book, Inspectors Fierz and Brinker received ballots, Tally Clerks Hoffman and Vincent kept poll lists, Inspector Manquen initialed and handed out the ballots; that, when the polls were first opened, a crowd of several hundred voters were in attendance; that the pressure of voting was great until about 2 o'clock in the afternoon, when it became easier; that the number of voters who were assisted because they could not read English was about the same as shown by relator's testimony; that a large number of Poles, Germans, and Italians were assisted in marking their ballots, because they could not read English; that the number thus assisted was the same as shown by the people's testimony; that none of the voters thus assisted was sworn as to his inability to read English; that in the early part of the day Inspectors Deimel and Vandergyp assisted voters in marking their ballots, always accompanying each other, until the rush or pressure of voting became so great it was thought necessary to assist voters in the following manner: Inspector Deimel, accompanied by a Republican United States officer, attended to one voter, while Inspector Vandergyp, accompanied by a Democrat United States officer, attended to another, and thus assistance in marking ballots was rendered by Inspectors Deimel and Vandergyp until, in the latter part of the day, the rush subsided; that no persons other than Inspectors Deimel and Vandergyp assisted any voter in marking his ballot; that no person other than the inspectors designated by the board to assist voters in marking their ballots, and the United States supervisors and deputy marshals on duty at this poll, saw how any ballot was marked; that the method pursued in assisting voters

in marking their ballots was adopted because it was believed that, on account of the large registration and the great number of voters needing assistance, the proper vote of the district could not be cast if the work of assisting voters in marking their ballots was to be done only by Deimel and Vandergyp in company with each other."

The law (Act No. 190, Laws of 1891) provides for a board of election inspectors, and places them in charge of the polling place, and gives them authority and control of the conduct of the election. Section 23 of the law provides that a challenger for each party may be present inside the room where the ballot-box is kept, and entitles him to the protection of the inspectors and the police. Section 25 makes it the duty of each inspector to challenge every person whom he shall know or suspect to be disqualified as an elector. Section 26 provides that if any elector shall show his ballot, or any part thereof, to any person (other than one lawfully assisting him in the preparation thereof), after the same shall have been marked, so as to disclose any of the candidates voted for, such ballot shall not be received or deposited in the ballot-box.

Section 32 provides:

"When any elector shall make oath that he cannot read English, or that because of physical disability he cannot mark his ballot, or when such disability shall be made manifest to said inspectors, his ballot shall be marked for him, in the presence of at least two of the inspectors, by an inspector designated by the board for that purpose, who is not a candidate on said ticket."

Section 36 provides that, in the canvass of the votes, any ballot which is not indorsed with the initials of the inspector, as provided in the act, and any ballot which shall bear any distinguishing mark or mutilation, shall be void, and shall not be counted, and any ballot or part of a ballot from which it is impossible to determine the elector's choice of candidates shall be void as to the candidate or candidates thereby affected.

The United States marshals present on election day were there under instructions from the Attorney General of the United States that they had the right, and that it was their duty, to be and remain in all places where they could best discharge their duties, whether such places were inside or outside the guard rail, notwithstanding local statutes regulating the number of persons who were to be admitted within the guard rail on election day. The United States supervisors were present, with instructions that it was their duty to put themselves in such a place that they could see that the tickets were marked as directed by the voters. This precinct was manned by six election inspectors, four of whom were Democrats, and two Republicans; two United States supervisors of election, one of whom was a Democrat and the other Republican; two challengers, one a Democrat and one a Republican; an interpreter; two deputy United States marshals; and two policemen stationed at the inner door. If any of these persons were not entitled to be present, they were there under color of right and authority, and with the knowledge, consent, and permission of the inspectors of election. Two of the inspectors of election were designated by the board to assist voters. A rush, incident to a crowded district, occurred, and in order to facilitate the voting and enable all to exercise the constitutional right of qualified electors, by and with the consent and approval of all present, the United States supervisors and the United States deputy marshals were called upon by the inspectors to assist, and did so. Seven Democrats were present, and did not object. Five Republicans were there, and concurred. Inspectors, supervisors, and marshals, all charged by law with the duty of its observance and the prevention of wrongdoing, and with the solemn duty of permitting electors to cast their ballots, all acting in good faith, and solely with the desire of

·enabling voters to exercise a constitutional right, consent, approve, and concur.

The right to vote for, and be represented by, county and state officers is a constitutional right, which cannot be taken away or destroyed. Cooley, Const. Lim. 616; McCrary, Elect. § 13.

John Erhard, a supervisor and a Democrat, saw the ballots of 20 of the said voters while they were being marked by a Republican inspector; William F. Schneider, a supervisor and a Republican, saw the ballots of 100 voters while assisted by a Democrat inspector; Joseph Deimel, a marshal and a Democrat, saw the ballots of 100 voters while being assisted by a Republican inspector; Peter Knauss, a marshal and a Republican, saw the ballots of 100 voters as they were being assisted by the Democrat inspector; and Joseph Deimel and Peter Knauss each, in the presence of an inspector of the opposite party, marked the ballots of 10 of the assisted voters. This occurred in the presence of the board of election inspectors; indeed, it was done with the consent, approval, and procurement of the board. The board, officers of the law, charged with control of the place, and with the instruction and direction of the voter, participated in the work. Supervisors and marshals, there by federal authority, charged with the duty of supervision, participated in the work. Each and every one of these officers was there commissioned to protect, instruct, and direct the voter. No challenge was made by any person. Relator's specification alleges that this was done with the approval of the chairman of the board of election inspectors. To these officers, *and to these officers only,* did voters *expose* (?) their ballots. Is it not monstrous to say that, under these circumstances, the voter and this entire precinct, composed of 1,156 qualified electors, shall be disfranchised? The law should not be so construed as to

make the machinery of election a snare to entrap the unsuspecting voter.

It may be urged that the voter is charged with knowledge of the law; but is he charged with knowledge of the personnel of the inspectors, or of those designated to assist him? Inspectors of election are not either uniformed or badged. Is each voter bound to suspect men there by authority, acting in the presence of the power that creates the actors, and to inquire by what authority? Of whom should the voter inquire, if not of the very men who were engaged in and directing this work? These men, whether inspectors, supervisors, or marshals, were there acting in the capacity of instructors or assistants, in the presence of the board of inspectors, the very power under the law that should designate and create assistants or instructors, and were recognized by all as having authority. Were they not, under all the authorities, *de facto* assistants and instructors? Is an elector to be disfranchised because one of these *de facto* officers looked upon his ballot? If respondent be ousted from his office, who shall say that no witnesses sworn by him while acting as clerk of the circuit court for the county of Wayne can be prosecuted for perjury, or that every subpœna or summons signed by him is a nullity, because he was not legally elected to the office of county clerk? Suppose that no assistant be actually designated by the board, but that one should act for the day in the presence of the board; would the absence of an express designation disfranchise the voter? McCrary, Elect. §§ 105, 214, 216.

In *Boileau's Case*, 2 Pars. 503, Brightly, Elect. Cas. 268, upon the afternoon of the day of election, one of the clerks of election became intoxicated and unfit for his duties, and, at the request of the inspectors, one Coxe acted as clerk for the remainder of the day, and until about 3 o'clock of the morning of the succeeding day, when the clerk, having

recovered from his debauch, appeared and signed the returns. Coxe was not sworn, and was a candidate for assessor at this election. Held, that these facts were not such as should induce the court to set the election aside, and the ground of the decision was that the evidence did not disclose any bad faith on the part of the officers, nor any fraud. In the same case, one Haines, a candidate for judge, was occasionally in the room where the election was held, during its progress and after the polls closed. He opened a few of the tickets, but, being admonished, desisted. Several witnesses testified to his handling tickets, and to his intermeddling. But the court say: "It has not been pretended that this election is in any particular tainted with actual fraud; no evidence has been adduced either showing legal votes to have been rejected or illegal votes received; the election seems to have been honestly conducted,"—and for these reasons the court declined to set it aside. *Anderson v. Winfree*, 85 Ky. 597.

But it is insisted that in this precinct, and in a large number of others, assisted voters were not first sworn. Whatever may be the construction of section 32 of the act, it is evident from this record that in all but a very few of the districts in the county of Wayne boards of inspectors have construed it to mean that, where the fact that an elector is unable to read English is made manifest, it is not necessary to require the oath provided for by statute. I do not, however, regard this requirement as mandatory. The oath is not required to determine the qualifications of the elector. It will be noticed that our statute does not prohibit the receipt of a ballot unless the voter has been first sworn, or declare that the ballot so received shall be void, but it does provide, by section 36, that ballots not initialed, or which bear a distinguishing mark or mutilation, shall not be counted, and that any ballot from which it is impossible to determine the elector's choice shall be

void. The rule as laid down in 6 Amer. & Eng. Enc. Law, p. 325, is as follows:

"When the election is fair and honest, courts will not disfranchise the voters, unless compelled to do so by the peremptory requirements of the law. Directory provisions are such as are not of the essence of the election, but are enacted as a guide to the officers of the elections. As to what requirements are mandatory, and what merely directory, the cases are not all in agreement, and it may be difficult in some cases to determine from the authorities into which class a provision falls; but it may be said that the tendency of the courts, and also of legislative bodies, is not to hold a provision mandatory, unless it is clearly of such a character that its violation will tend to prevent a correct determination of the result of the election, unless it is declared in the law that its violation shall render the election void. This is true even if the language is prohibitory as to the officers, or even if its violation may subject the offending officer to penal liability."

Judge McCrary, in his work on Elections (sections 190, 191), states the rule thus:

"If the statute expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statute must so hold, whether the particular act in question goes to the merits or affects the result of the election or not. Such a statute is imperative, and all considerations touching its policy or impolicy must be addressed to the legislature. But if, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election. * * * Statutes which simply direct the judges of election to number the ballots, without declaring what consequences shall follow if this be not done, may well be held directory only; but, where the statute both gives the directions and declares what the consequences of neglecting their observance shall be, there is no room for construction." Citing *Ledbetter v. Hall*, 62 Mo. 422; *West v.*

*Ross*, 53 Id. 350; *Jones v. State*, 1 Kan. 273; *Gilleland v. Schuyler*, 9 Id. 569.

See, also, *Peard v. State*, 34 Neb. 372.

It is true that a number of cases may be found holding certain provisions of certain statutes to be mandatory. The section in question here was not under discussion in *Attorney General v. McQuade*, 94 Mich. 439. That case came here upon the pleadings, involving grave and flagrant charges. Willful and fraudulent conduct was set forth. The present case, when here upon the pleadings, did not disclose the real facts or issues involved. *People v. Canvassers*, 129 N. Y. 395, was an application for a *mandamus* to compel the rejection of certain ballots. The court held that the ballots contained distinguishing marks, and were within the prohibition of the statute. The court say, however, that, in the absence of some clear and positive prohibition of the statute against counting such ballots, the tendency of the courts would undoubtedly be in the direction of effectuating as far as possible the intent of the voter. *People v. Board of Supervisors*, 135 N. Y. 522, and *Bechtel v. Albin*, 134 Ind. 193, were both cases of marked ballots. In *Re Ballot Marks* (R. I.), 27 Atl. Rep. 608, the governor requested an opinion as to whether a cross placed at the right of a blank space below the names of the candidates on an official ballot, and opposite no name thereon, should be counted for any candidate on said ballot. The court held that a compliance with the requirement was necessary to determine the elector's intention, and that the ballot should not be counted. In *Baxter v. Ellis*, 111 N. C. 124, the court held that the letters O. K., written on the outside of a ballot, are a device within the code, providing that ballots shall be "without device," and that any ballot having a "device" on it shall be void. In *Phelan v. Walsh*, 62 Conn. 260, the principal contro-

versy arose over a large number of double ballots, and upon the construction of the statute respecting their disposition. Other questions related to distinguishing marks upon ballots. In *Spurgin v. Thompson*, 37 Neb. 39, it was held that the indorsement of the name of "Eagleham" upon a ballot was within the inhibition of the statute forbidding the marking of the ballot; and in the same case it was held that, while the statute requires that the cross which signifies the preference of the elector shall in ink be placed in a space designated for that purpose, a ballot upon which such preference is indicated by a cross made with a lead pencil, outside the space designated, but opposite the name of the choice of the elector, should be counted according to such manifest intention. None of these cases are opposed to the rule above laid down. The statutes in each case contain provisions similar to those contained in section 36 of our own statute, thus bringing the cases within the rule as stated.

In *Bowers v. Smith*, 111 Mo. 45, there is a very able and exhaustive discussion of the Australian ballot laws of England, Missouri and other states, and of the principle embraced in the rule referred to. The court say:

"Undoubtedly, some irregularities are of so grave a nature as to invalidate the whole return of the precinct at which they occur; as, for example, the omission of registration. *Zeiler v. Chapman* (1874), 54 Mo. 502. In determining which are of that kind, the courts aim merely to give effect to the intent of the law-makers in that regard, aided by established rules of interpretation. If the law itself declares a specified irregularity to be fatal, the courts will follow that command, irrespective of their views of the importance of the requirement. *Ledbetter v. Hall* (1876), 62 Mo. 422. In the absence of such declaration, the judiciary endeavor, as best they may, to discern whether the deviation from the prescribed forms of law had or had not so vital an influence on the proceedings as probably prevented a free and full expression of the popular will. If it had, the irregularity is held to vitiate

the entire return; otherwise, it is considered immaterial. It has been sometimes said, in this connection, that certain provisions of election laws are mandatory, and others directory. These terms may, perhaps, be convenient to distinguish one class of irregularities from the other. But, strictly speaking, all provisions of such laws are mandatory in the sense that they impose the duty of obedience on those who come within their purview. But it does not therefore follow that every slight departure therefrom should taint the whole proceedings with a fatal blemish. Courts justly consider the chief purpose of such laws, namely, the obtaining of a fair election and an honest return, as paramount in importance to the minor requirements which prescribe the formal steps to reach that end; and, in order not to defeat the main design, are frequently led to ignore such innocent irregularities of election officers as are free of fraud, and have not interfered with a full and fair expression of the voters' choice."

In *Woodward v. Sarsons,* 44 Law J. C. P. 293, it was held that where there was no ground for thinking that the electors had been prevented from voting as they wished, and the election was substantially one by ballot, it would not be invalidated because there may have been mistake or misconduct in the use of the machinery of the ballot act; but that, in order to have this effect, the non-observance of the forms of the act must be so great as to amount to conducting the election contrary to the principle of an election by ballot, and be such that it did affect, or might have affected, the result.

The statutes of Illinois provide that no vote shall be received if the name of the person tendering the same be not registered, unless such person shall furnish to the judges of election his affidavit that he is an inhabitant of the district and entitled to vote therein, and also prove by the oath of a householder and registered voter of the district that he knows such person to be an inhabitant of the district; but nevertheless it has been held in that state that when a person votes without having been registered, and without proof of right, and it does not appear that he

was challenged, or any objection made to his voting, the presumption must be that he was a legal voter, and so known to the judges of the election. *Dale v. Irwin*, 78 Ill. 170; *Clark v. Robinson*, 88 Id. 498; *Kuykendall v. Harker*, 89 Id. 126. In *State v. O'Day*, 69 Iowa, 368, it was held that no objection could be based upon the fact that an informal oath was administered to a legal voter; that an informal oath is no oath; and that, if the voter was a qualified elector, his ballot was lawfully received, even though he had not been sworn at all.

There is a conflict in the authorities upon this subject. In the case of *Reg. v. McNeil*, 5 U. C. C. P. 137, where the votes of persons who had refused to take the oath had been received, the court excluded the votes, not because the voters were shown to be disqualified, but because they had refused to take the required oath of qualification; but, as has been said by one writer, where the voter has not been challenged, it may well be doubted whether, in the absence of any showing of fraud, the omission of the officers to require the statutory proof rebuts the presumption that the vote received is legal. In Wisconsin, where it is provided that no person whose name is not on the register shall be allowed to vote without furnishing certain proofs, it is held that this prohibition is mandatory, and that all votes received in violation of the provision should be rejected. *State v. Hilmantel*, 21 Wis. 566. In a number of cases it has been held, and Judge McCrary, in his work on Elections, upholds this view, that the vote is illegal, but that it may be counted upon proof that the person was a qualified voter. It is not necessary here to determine which rule, in our view, is the correct one, for no such case is here. There is an essential difference between requirements which go to the qualification of the elector and those police regulations relative to the means employed to get the ballots of qualified voters into the

ballot-box, the enforcement of which regulations is committed to officers designated by law for that purpose.

Intelligent men, familiar with the English language, have not readily grasped the intricacies of this new system or of the prescribed ballot. It is notorious that the class of electors who were assisted are wholly unfamiliar with our language. They comprehend an oath from the signs which attend its administration rather than from the language of such oath. These men were duly-qualified electors, under the law. No fraud is charged. The only complaint made is that legal voters, entitled to vote, have voted without the observation of the machinery of the ballot act, — without the observance of a regulation, the enforcement of which was committed to the election officers. Yet those officers directed the conduct of these electors, and, with a full knowledge of the facts, received these votes unchallenged. Under these circumstances, I think the presumption should prevail that these voters could not read English, and that the inspectors of election were satisfied of that fact.

It is, however, urged that, inasmuch as these voters were not sworn, that part of section 26 which provides that if any elector shall show his ballot, or any part thereof, to any person (other than one lawfully assisting him in the preparation thereof), after the same shall have been marked, such ballot shall not be received or deposited in the ballot-box, applies, so that an exposure to an assistant vitiates the ballot. I do not think that the statute is subject to this strained construction. The oath is to be administered, not by the assistant, but before the board. The language of the section refers to the qualifications of the assistant, and not to the observance by the voter of the provisions of another section. If the provision that the elector should be first sworn is directory only, any process that such ballot passed through in the ordinary

course did not invalidate it. The question here is not the right of the assistant to refuse to assist, the right of the board to refuse to receive a ballot, or the right of a voter who refused compliance with a requirement, but the rights of those who have complied with all that was required of them.

The purpose of this act is to secure to the elector an opportunity to exercise a sacred constitutional right, and the expression of the will of the majority, as well as to secure the purity and integrity of the ballot. The right of an elector to vote is the paramount right. The act was not framed to prevent the exercise of this right, nor should it receive a construction which will encourage the packing of voting precincts. The electors, and the other actors involved in the charges here made, were innocent of wrong. No voter has been denied the right to vote. All who voted, except, possibly, the 14, had all the qualifications of electors, and were entitled to vote. The effect of the rulings of the court below is to change a majority of 118 in favor of the respondent to one of 1,926 in favor of relator, and to disfranchise nearly 3,900 voters.

The construction given to this act by the court below leads to gross injustice, and I cannot but feel that there is fault in such construction, and that such a result was never intended or suspected by the Legislature in framing the act. As is said by Barclay, J., in *Bowers v. Smith*, *supra*:

"While it is well enough to insist on a proper and strict performance of duty by officers conducting elections, we are not of the number of those who imagine that such performance will be promoted by disfranchising the whole body of electors in any locality where errors, such as here charged, occur. The legislature has not plainly declared such a purpose, and we think it should never be imported into a statute by construction."